# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

IN THE MATTER OF HIGHLAND CAPITAL MANAGEMENT, L.P.

DEBTOR

HIGHLAND CAPITAL MANAGEMENT, L.P.,

APPELLEE

v.

NEXPOINT ASSET MANAGEMENT, L.P., FORMERLY KNOWN AS
HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.;
NEXPOINT ADVISORS, L.P.; NEXPOINT REAL ESTATE PARTNERS,
L.L.C., FORMERLY KNOWN AS HCRE PARTNERS L.L.C.; HIGHLAND
CAPITAL MANAGEMENT SERVICES, INCORPORATED; JAMES
DONDERO,

APPELLANTS

---

IN THE MATTER OF HIGHLAND CAPITAL MANAGEMENT, L.P.

DEBTOR

JAMES D. DONDERO,

APPELLANT

v.

HIGHLAND CAPITAL MANAGEMENT, L.P.,

APPELLEE

---

CONSOLIDATED WITH

No. 23-10921

IN THE MATTER OF HIGHLAND CAPITAL MANAGEMENT, L.P.

DEBTOR

HIGHLAND CAPITAL MANAGEMENT, L.P.,

APPELLEE

v.

NEXPOINT ASSET MANAGEMENT, L.P., FORMERLY KNOWN AS
HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.,

APPELLANT

Appeal from the United States District Court
Northern District of Texas
The Honorable Brantley Starr
Civ. Act. No. 3:21-cv-00881-X

## APPELLEE'S BRIEF

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz
John A. Morris
Gregory V. Demo
Hayley R. Winograd
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
(310) 277-6910

HAYWARD PLLC
Melissa S. Hayward
(Texas Bar No. 24044908)
Zachery Z. Annable
(Texas Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
(972) 755-7100

*Counsel for Appellee*

# CERTIFICATE OF INTERESTED PERSONS

Appellee certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal:

1.    Appellee:

Highland Capital Management, L.P.

2.    Counsel for Appellee:

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
**PACHULSKI STANG ZIEHL & JONES LLP**
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

-and-
Melissa S. Hayward (Texas Bar No. 24044908)
Zachery Z. Annable (Texas Bar No. 24053075)
**HAYWARD PLLC**
10501 N. Central Expy., Ste. 106
Dallas, Texas 75231

3.    Appellants:

NexPoint Asset Management, L.P., formerly known as Highland Capital Management Fund Advisors, L.P.;

NexPoint Advisors, L.P.;

NexPoint Real Estate Partners, L.L.C., formerly known as HCRE Partners L.L.C.;

Highland Capital Management Services, Incorporated; and

James Dondero

4.    <u>Counsel for Appellants:</u>

Deborah Deitsch-Perez, Esq.
Michael Aigen, Esq.
**STINSON LLP**
2200 Ross Avenue, Suite 2900 Dallas, TX 75201

-and-

Davor Rukavina
Julian P. Vasek
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard Street, Suite 3800
Dallas, Texas 75202-2790

By:  */s/ Zachery Z. Annable*
      Zachery Z. Annable

## STATEMENT REGARDING ORAL ARGUMENT

Appellee respectfully submits that oral argument is unlikely to aid the Court in resolving the questions presented because (a) the appeal plainly lacks merit, (b) no novel or unusual issues are raised, and (c) the parties' briefs adequately argue the parties' positions.

SUMMARY OF ARGUMENT ............................................................................1

STATEMENT OF THE CASE ..........................................................................5

    A.    Background ............................................................................5

        1.    Parties and Witnesses ..................................................5

            a.    The Bankruptcy Case...................................5

            b.    Key Players ...................................................5

        2.    Procedural Overview ...................................................6

    B.    The Demand Notes..........................................................7

    C.    The Term Notes ...............................................................8

    D.    HCMFA's Pre-2019 Notes ...........................................9

    E.    Highland Commences the Adversary Proceedings to Collect Under the Defaulted Notes .................................................10

    F.    Appellants Ignore the Indisputable, Overwhelming Evidence Contradicting All Defenses .................................................11

        1.    Highland's *Prima Facie* Case ...................................12

            a.    *Prima Facie* Case Against Main Note Defendants ........12

            b.    *Prima Facie* Case Against HCMFA in Second HCMFA Action ..........................................................13

        2.    The Obligors Always Treated the Notes as Valid, Enforceable Obligations, Not Subject to Discount or Defense...................................................................13

        3.    Recovery on the Notes Was a Significant Component of the Debtor's Plan Yet the Obligors Remained Silent on the Point Despite Lodging Other Objections..................................15

    G.    The Alleged Agreement Defense Is Meritless.....................................17

        1.    The Alleged Agreement Defense Was Fabricated During Discovery ...........................................................18

        2.    The Donderos' Post-Commencement Statements Concerning the Alleged Agreements Are Not Corroborated ..........................................................21

3.  Even if the Alleged Agreements existed, they are Unenforceable for Lack of Consideration ..................................27

4.  Dugaboy Lacked Authority to Enter Into the Alleged Agreements ................................................................................28

H.  HCMFA's "Mutual Mistake" Defense Is Meritless.............................29

1.  HCMFA Always Treated the 2019 Notes as Valid, Enforceable Obligations, not Subject to Discount or Defense.................................................................................30

2.  The "Mutual Mistake" Defense was Fabricated During Litigation ...............................................................................32

I.  Other Affirmative Defenses Asserted.................................................32

1.  The "Prepayment" Defense Is Meritless....................................32

2.  The "Negligence" Defense Is Meritless....................................34

ARGUMENT ....................................................................................................36

A.  Legal Standard....................................................................................36

B.  The District Court Correctly Held That No Genuine Dispute of Material Fact Regarding the Non-Existence of the Alleged Agreements................................................................................40

1.  No Reasonable Jury Could Find that the Alleged Agreements Exist Based on the Donderos' Self-Serving and Unsubstantiated Statements in the Main Notes Litigation ...............................................................................40

2.  The Dondero Declarations Fail to Create a Genuine Dispute of Material Fact Concerning the Non-Existence of the Alleged Agreement in the Second HCMFA Action ...........45

a.  The District Court Correctly found that the Dondero Declarations Are Contradictory and Internally Inconsistent ................................................46

b.  The District Court Correctly Found that Mr. Dondero's Declaration Contradicts His Prior Sworn Testimony Regarding the Alleged Agreements .............48

c.  The District Court Correctly Found that Mr. Dondero's Declaration Contradicts HCMFA's Answer .........................................................................50

3.  Appellants' Remaining Contentions are Insufficient to Create a Genuine Dispute of Fact Regarding the Non-Existence of the Alleged Agreement ........................................53

    a.  HCMFA's Contention that Mr. Dondero's Silence upon Sale of MGM Is Not "Probative" of Whether the Alleged Agreement Exists Fails to Create a Genuine Dispute of Material Fact ..................................53

    b.  The District Court Correctly Found that the Alleged Agreements Would Not Constitute Valid Contracts .......54

    c.  The District Court Correctly Found that Nancy Dondero Did Not Have Authority to Enter Into the Alleged Agreement ..........................................................57

    d.  Appellants' Contention that Nancy Dondero Was "Competent" to Enter into the Alleged Agreement is Without Merit and Fails to Create a Genuine Dispute of Material Fact Regarding the Non-Existence of the Alleged Agreement ..............................58

    e.  Appellants' Assertion that the Nondisclosure of the Alleged Agreements Have No "Bearing" on their Enforceability Misses the Point ......................................59

C.  The District Court Correctly Found that There Was No Genuine Dispute of Material Fact That Highland Had No Contractual Obligation to Make Payments on Behalf of the Term Note Obligors ...............................................................................60

D.  The District Court Correctly Found That There is No a Genuine Dispute of Material Fact that the NexPoint, HCMS, and HCRE Notes Were Not "Prepaid"...................................................................62

E.  The District Court Correctly Found That There is No Genuine Dispute of Material Fact Regarding HCMFA's "Mutual Mistake" Defense ...............................................................................64

    1.  Waterhouse Had Actual and Apparent Authority to Execute the HCMFA Notes ......................................................64

    2.  The District Court Correctly Found that HCMFA Failed to Raise a Genuine Issue of Material Fact Concerning the Mutual Mistake Defense .........................................................68

CONCLUSION .......................................................................................72

# TABLE OF AUTHORITIES

## CASES

*1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC,*
  584 S.W.3d 53 (Tex. App. 2018) .................................................................59

*271 Truck Repair & Parts, Inc. v. First Air Express, Inc.,*
  03-0700498- CV, 2008 WL 2387630 (Tex. App.— Austin June 11,
  2008, no pet.) ............................................................................................43

*Addicks Services, Inc. v. GGP-Bridgeland, LP,*
  596 F.3d 286 (5th Cir. 2010).......................................................................64

*Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.,*
  MO:19-CV-173-DC, 2021 WL 2772808 (W.D. Tex. Apr. 28, 2021)..... 72, 74

*Al-Saud v. Youtoo Media, L.P.,*
  3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. March 15, 2017) .............42

*Alton v. Texas A&M University,*
  168 F.3d 196 (5th Cir. 1999).................................................................. 37, 40

*Armstrong v. City of Dallas,*
  997 F.2d 62 (5th Cir.1993)...........................................................................40

*Bargher v. White,*
  928 F.3d 439 (5th Cir. 2019).......................................................................44

*BMG Music v. Martinez,*
  74 F3d 87 (5th Cir. 1996) ....................................................................... 41, 46

*Brown v. City of Houston, Tex.,*
  337 F.3d 539 (5th Cir. 2003)............................................................ 36, 38, 60

*Buxani v. Nussbaum,*
  940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ)...........................43

*Commercial Capital Holding Corp. v. Team Ace Joint Venture,*
  No. CIV. A. 99-3040, 2000 WL 726880 (E.D.La. June 2, 2000) ........... 67, 69

*Cooper Cameron Corp. v. United States Dep't of Labor,*
  280 F.3d 539 (5th Cir. 2002).......................................................................50

*Davis v. Bank of Am., N.A.,*
  No. H–13–1306, 2014 WL 1401677 (S.D.Tex. Apr. 10, 2014).............. 68, 70

*DIRECTV, Inc. v. Budden,*
    420 F.3d 521 (5th Cir. 2005)..................................................................46

*Eason v. Thaler,*
    73 F.3d 1322 (5th Cir. 1996)................................................................47

*FDIC v. Cardinal Oil Well Servicing Co.,*
    837 F.2d 1369 (5th Cir.1988)................................................................38

*First Com. Bank v. Palmer,*
    226 S.W.3d 396 (Tex. 2007).................................................................59

*Fisher v. Blue Cross and Blue Shield of Tex., Inc.,*
    3:10-CV-2652-L, 2015 WL 5603711 (N.D. Tex. Sept. 23, 2015)................42

*Franklin v. Regions Bank,*
    CV 5:16-1152, 2021 WL 867261 (W.D. La. Mar. 8, 2021)........................42

*Free v. Wal-Mart Louisiana, L.L.C.,*
    815 F. App'x 765 (5th Cir. 2020)...........................................................53

*Freeman v. City of Fort Worth, Texas,*
    4:10-CV-888-Y, 2011 WL 2669111 (N.D. Tex. July 7, 2011)...............50, 54

*Gaines v. Kelly,*
    235 S.W.3d 179 (Tex. 2007).................................................................71

*Garcia v. Lumacorp, Inc.,*
    No. CIV.A. 3:02-CV-2426, 2004 WL 1686635 (N.D. Tex. July 27,
    2004)...............................................................................................59

*Hacienda Records, L.P. v. Ramos,*
    718 F. App'x 223 (5th Cir. 2018).......................................................52, 53

*Hall v. Branch Banking,*
    No. H-13-328, 2014 WL 12539728 (S.D.Tex. Apr. 30, 2014)....................39

*Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding,*
    480 S.W.2d 607 (Tex. 1972).................................................................42

*Hitachi Capital Am. Corp. v Med. Plaza Surgical Ctr., LLP.,*
    CIV.A. 06-1959, 2007 WL 2752692 (S.D. Tex. Sept. 20, 2007)..................74

*Hoard v. McFarland,*
    229 S.W. 687 (Tex. Civ. App. 1921).......................................................60

*Honore v. Douglas,*
    833 F.2d 565 (5th Cir. 1987).................................................................42

*In re El Paso Pipeline, L.P. Derivative Litig.,*
    132 A.3d 67 (Del. Ch. 2015).................................................................28

*In re Highland Cap, Mgmt., L.P.,*
    48 F.4th 419 (5th Cir. 2022).................................................................16

*In re Magna Cum Latte, Inc.*,
    07-31814, 2007 WL 3231633 (Bankr. S.D. Tex. Oct. 30, 2007)........... 37, 39

*In re Mun. Bond Reporting Antitrust Litig.*,
    672 F.2d 436 (5th Cir. 1982)................................................. 40, 46

*In re Palms at Water's Edge, L.P.*,
    334 B.R. 853 (Bankr. W.D. Tex. 2005) ......................................42

*Jonibach Management Trust v. Wartburg Enterprises, Inc.*,
    136 F. Supp. 792 (S.D. Tex. 2015) .........................................53

*Kariuki v. Tarango*,
    709 F.3d 495 (5th Cir. 2013)................................................41

*Katy Int'l, Inc. v. Jinchun Jiang*,
    451 S.W.3d 74 (Tex. App. 2014) ...........................................59

*Kennett-Murray Corp. v. Bone*,
    622 F.2d 887 (5th Cir. 1980)............................................ 54, 55

*Kirkindoll v. Nat'l Credit Union Admin. Bd.*,
    3:11-CV-1921-D, 2015 WL 1636534 (N.D. Tex. Apr. 13, 2015)........... 70, 71

*Latimer v. Smithkline & French Laboratories*,
    919 F.2d 301 (5th Cir.1990)............................................. 37, 39

*Lester v. Wells Fargo Bank, N.A.*,
    805 Fed. Appx. 288 (5th Cir. 2020) ..................................... 43, 44

*Looney v. Irvine Sensors Corp.*,
    CIV.A.309-CV-0840-G, 2010 WL 532431
    (N.D. Tex. Feb. 15, 2010)......................................... 38, 39, 72, 73

*Lowery v. Bank of Am., N.A.*,
    04-12-00729-CV, 2013 WL 5762227Tex. App. Oct. 23, 2013) ...................70

*Main Street Bank v. Unisen, Inc.*,
    No. H-06-3776, 2008 WL 11483415 (S.D. Tex. Feb. 15, 2008)..................47

*Marx v. FDP, LP*,
    474 S.W.3d 368 (Tex. App. 2015) ...........................................59

*Mays v. Dir. Office of Workers' Comp. Programs*,
    938 F.3d 637 (5th Cir. 2019)...............................................55

*Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*,
    40 F.3d 698 (5th Cir. 1994)................................................39

*Perma Research & Development Co. v. Singer Co.*,
    410 F.2d 572 (2d Cir. 1969)...............................................54

*Polland & Cook v. Lehmann*,
    832 S.W.2d 729 (Tex. App. 1992) ....................................... 67, 69

*Pryor v. Everhome Mortg. Co.,*
    No. 3:13–CV–2963–D, 2014 WL 5802716 (N.D.Tex. Nov. 7, 2014) ..........70

*Resolution Tr. Corp. v. Starkey,*
    41 F.3d 1018 (5th Cir. 1995)........................................................................38

*Roark v. Stallworth Oil and Gas, Inc.,*
    813 S.W.2d 492 (Tex. 1991) ........................................................................58

*Salama v. W. Wind Energy Corp.,*
    No. 4:12–cv–035352013, WL 6079548 (S.D. Tex. Nov. 19, 2013)..............46

*Scott v. Harris,*
    550 U.S. 372 (2007).............................................................................. 47, 50

*Turner v. Baylor Richardson Med. Ctr.,*
    476 F.3d 337 (5th Cir. 2007)........................................................................39

*United States v. Lawrence,*
    276 F.3d 193, 197 (5th Cir. 2001)................................................................41

*Vais Arms, Inc. v. Vais,*
    383 F.3d 287 (5th Cir. 2004)........................................................................46

*Warfield v. Byron,*
    436 F.3d 551 (5th Cir. 2006)........................................................................37

*Whitney Nat. Bank v. Med. Plaza Surgical Center L.L.P.,*
    No. H-06-1492, 2007 WL 3145798 (S.D.Tex. Oct. 27. 2007) .............. 72, 73

*Wimm v. Jack Eckerd Corp.,*
    3 F.3d 137 (5th Cir. 1993)............................................................................74

## STATE CASES

Tex. Bus. & Comm. Code § 3.402(a) .................................................................67

Tex. Bus. & Comm. Code § 3.403 .....................................................................67

## OUT OF STATE CASES

Fed. R. Bankr. P. 56(c) .....................................................................................36

## OTHER AUTHORITIES

Martin I. Lubaroff & Paul M. Altman,
    *Delaware Limited Partnerships* § 1.2 (Supp. 2015)....................................28

# ISSUES PRESENTED

1.     Whether the District Court correctly held that there is no genuine dispute of material fact regarding the Alleged Agreement defense?

2.     Whether the District Court correctly held that there was no genuine dispute of material fact that Highland had no contractual obligation under the shared services agreement to make payments on behalf of Appellants NexPoint, HCMS, and HCRE with authorization?

3.     Whether the District Court correctly held that there was no genuine dispute of material fact that the NexPoint and HCMS Notes were not prepaid?

4.     Whether the District Court correctly held that there is no genuine dispute of material fact regarding HCMFA's "Mutual Mistake" defense?

# SUMMARY OF ARGUMENT

The District Court's findings that Appellants failed to create a genuine dispute of material fact sufficient to rebut Highland's *prima face* case for summary judgment on the Notes are supported by overwhelming evidence. The District Court's Orders granting summary judgment for Appellants' breach of the Notes should be affirmed in all respects. The overwhelming evidence demonstrates the existence, validity, and enforceability of the Notes, that Appellants are in default, and that there are amounts due and owing exceeding $70 million. Appellants fail to raise a genuine dispute of material fact in support of any of their defenses to collection.

***First***, there is no competent evidence to corroborate the Alleged Agreement defense, which is premised on the claim that Dondero and his sister, Nancy, had secret, annual discussions during which they orally agreed that Highland would "forgive" tens of millions of dollars of loans if either Dondero sold certain assets above cost or a third party sold them. The only "evidence" supporting this fabricated defense are the Donderos' self-serving, unsubstantiated, internally inconsistent, and contradictory statements that they created the Alleged Agreements with each other. By contrast, a mountain of evidence—including promissory notes, audited financial statements, internal accounting records, contemporaneous e-mails, and dozens of bankruptcy filings—corroborate the validity, existence, and enforceability of the Notes. Where, as here, the only evidence to rebut summary judgment is a sham,

manufactured story, such a scintilla of evidence is insufficient to create a *genuine* dispute of material fact.

**Second**, the District Court correctly held there was no genuine dispute of material fact that Highland had no contractual or other obligation to make payments on behalf of the Term Note Obligors. The Term Note Obligors' assertion that Highland's "negligence" caused them to default fails as a matter of law. Under the clear and unambiguous terms of NexPoint's shared service agreement, Highland had no duty or right to make payments on NexPoint's behalf without authorization. And even if it did, Waterhouse testified that Dondero instructed him in early December 2020 not to make any payments to Highland. HCMS and HCMS's defense on this ground is even more frivolous because, as the District Court found, there was no evidence HCMS and HCRE even had a shared services agreement with Highland. The Term Note Obligors fail to point to any competent summary judgment evidence showing that Highland had a contractual obligation to make payments on their behalf without authorization (and even if it did, Dondero directed Waterhouse not to make any payments).

**Third**, the District Court correctly held that there is no genuine dispute of material fact that NexPoint's and HCMS's Notes were not "prepaid." The Term Notes unambiguously provide that "prepayments" can be made and must first be applied to "unpaid accrued interest" and then to unpaid principal. Contrary to

Appellants' unsupported assertion, the Notes simply do not provide that "prepayments" would be held in reserve to satisfy future obligations. In fact, the Term Note Obligors' pre-litigation conduct also contradicts this defense because (consistent with the requirements under the Notes), they paid their Annual Installment Payment on time even after making millions of dollars in "prepayments" during the prior year. In light of the clear and unambiguous terms of the Notes and Appellants' own conduct, there is simply no support for the "prepayment" defense, and no reasonable jury could believe it.

*Finally*, the District Court properly found that there is no genuine dispute of material fact concerning HCMFA's Mutual Mistake Defense, in which HCMFA baldly asserts that HCMFA's officer, Waterhouse, executed HCMFA's 2019 Notes "without authority" and by "mistake." Any notion that Waterhouse lacked authority to execute the HCMFA Notes is refuted by overwhelming evidence, including HCMFA's Incumbency Certificate in which Dondero expressly certified that Waterhouse was an officer of HCMFA's general partner and was authorized to execute all agreements on HCMFA's behalf; Waterhouse, as HCMFA's Treasurer, was responsible for HCMFA's accounting and finance; Waterhouse swore that he would not have signed HCMFA's 2019 Notes if he did not believe he was authorized to do so; Waterhouse signed other agreements binding Dondero affiliates to substantial obligations (including other Notes at issue on this appeal); and no one,

including Dondero, ever told Waterhouse he was not authorized to sign the HCMFA Notes. HCMFA's assertion that the HCMFA Notes were executed as a result of "mutual mistake" is equally baseless. This defense, premised on the notion that the money loaned by Highland to HCMFA in exchange for the Notes was supposed to be "compensation" for the NAV Error is not corroborated by a single document or any other competent evidence suggesting that Highland caused or accepted responsibility for the NAV Error or agreed to compensate HCMFA for anything. Again, to the contrary, the overwhelming evidence—in the form of audited financial statements, books and records, email communications, HCMFA's receipt of insurance proceeds, and representations to third parties—unequivocally proves that HCMFA and Highland intended to execute and honor the HCMFA Notes. No evidence suggests that Highland and HCMFA shared a common misunderstanding regarding the purpose of the HCMFA Notes, and no reasonable jury could believe they did.

The District Court's Orders should be affirmed.

**STATEMENT OF THE CASE**

**A.  Background**[1]

  **1.  Parties and Witnesses**

    **a.  The Bankruptcy Case**

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Case"). Highland's plan of reorganization (the "Plan") was confirmed on February 22, 2021 [Docket No. 1943] and went effective on August 11, 2021 [Docket No. 2700].

    **b.  Key Players**

Highland was co-founded in 1993 by James Dondero ("Dondero") and Mark Okada ("Okada") and previously managed substantial investment portfolios and assets. (*See* ROA.75154 at 2). Highland was the payor under the Notes and was the debtor-in-possession in the Bankruptcy Case when it commenced the Adversary Proceedings.

Prior to the Petition Date, Dondero controlled Highland and authorized its bankruptcy filing. Shortly after an official committee of unsecured creditors (the "Committee") was appointed, Dondero's relationship with the Committee became contentious due to the Committee's distrust of Dondero stemming from his conflicts

---

[1] Capitalized terms not defined herein shall take on the meanings ascribed below.

5

of interest, history of litigation, and self-dealing. (*See* ROA.75155 at 3). To avoid the appointment of a chapter 11 trustee, Dondero relinquished control of Highland to an independent board (the "<u>Independent Board</u>") approved by the Bankruptcy Court. *See* Bankr. Docket No. 339.

Appellants HCMFA, HCRE, HCMS, and NexPoint were (and still are) entities owned or controlled by Dondero and operated on the Highland platform prior to the Petition Date. (*See* ROA.75158 at 6).

Nancy Dondero ("<u>Nancy</u>") is Dondero's sister. In October 2015, at Dondero's request, Nancy became the sole Trustee of Dugaboy—a trust for which Dondero is the sole lifetime beneficiary—and has served as Dugaboy's trustee since that time.

Frank Waterhouse ("<u>Waterhouse</u>") was Highland's CFO from late 2011 until early 2021. While serving as Highland's CFO, Waterhouse simultaneously served as (a) the Treasurer of Appellants HCMFA, NexPoint, and HCMS, and (b) Principal Executive Officer of certain retail funds managed by the NexPoint and HCMFA (together, the "<u>Advisors</u>"). In those capacities, Waterhouse was responsible for, among other things, managing the applicable entities' accounting and finance functions.

## 2.     **<u>Procedural Overview</u>**

On January 22, 2021, Highland commenced the Adversary Proceedings against Appellants in the Main Notes Litigation, and on November 9, 2021, Highland

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

commenced the Second HCMFA Action against HCMFA. The Adversary Proceedings were consolidated for discovery purposes and referred to the Bankruptcy Court for pre-trial matters, including for consideration (but not determination) of dispositive motions.

Highland ultimately moved for summary judgment against all Appellants in in the Main Notes Litigation and in the Second HCMFA Action. On July 19, 2022 and October 11, 2022, the Bankruptcy Court issued its reports and recommendations (ROA.34330-34374, ROA.75153-75202) (the "R&Rs") to the District Court recommending that Highland's Summary Judgment Motions be granted. On August 3, 2023, the District Court adopted the Bankruptcy Court's R&Rs and issued judgments against Appellants. (Case No. 21-cv-03082-sgj); ROA.11638-11640 (Case No. 21-cv-03005-sgj); ROA.11641-11645 (Case No. 21-cv-03007-sgj); ROA.11646-11650 (Case No. 21-cv-03006-sgj); and ROA.11651- 11654 (Case No. 21-cv-03003-sgj) (the "Orders").

## B.    **The Demand Notes**

From 2013 through 2019, Dondero, HCMFA, HCMS, and HCRE borrowed tens of millions of dollars from Highland and executed certain two-page demand notes, as makers, in favor of Highland (collectively, the "Demand Notes") to

evidence the cash loans ROA.34338-34341.[2] As the District Court found, (a) except for the date, amount, maker, and interest rate, the Demand Notes are identical; (b) on December 3, 2020, "with its Chapter 11 plan coming up for confirmation and its need of funding to pay its millions of dollars' of debt owed to creditors," Highland made written demands for payment of all obligations due under the Demand Notes; (c) the Demand Note Obligors defaulted by failing to make the required payments; and (d) Highland was owed more than $23 million on the Demand Notes at the time of default, excluding costs of collection. *Id.* at ROA.34341-34343 (citing evidence). These facts are undisputed.

## C.    **The Term Notes**

On May 31, 2017, Dondero executed separate 30-year term note on behalf of NexPoint, HCMS, and HCRE, respectively, each as a maker, all in favor of Highland (collectively, the "Term Notes"). ROA.34343.[3] Each Term Note "rolled up obligations of the makers under prior notes" that were tendered in exchange for cash money loans to "enable [the borrowers] to make investments." *Id.* at ROA.34343-34344 (citing evidence).

---

[2] In their capacities as makers under their respective Demand Notes, Dondero, HCMFA, HCMS, and HCRE are collectively referred to as the "Demand Note Obligors."

[3] In their capacities as makers under their respective Term Notes, NexPoint, HCMS, and HCRE are collectively referred to as the "Term Note Obligors" (and together with the Demand Note Obligors, the "Obligors" or "Appellants").

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

As the District Court found, (a) except for the date, amount, maker, and interest rate, the Term Notes are identical; (b) the Term Note Obligors defaulted by failing to make their respective Annual Installment Payment when due on December 31, 2020;[4] (c) after default, Highland accelerated the Term Notes in accordance with their terms; and (d) Highland was owed more than $36 million on the Term Notes at the time of default, excluding costs of collection. *Id.* at ROA.34344-34346 (citing evidence). These facts are undisputed.

## D. HCMFA's Pre-2019 Notes

HCMFA was also the maker under two additional demand notes tendered to Highland in 2014 and 2016, respectively, in exchange for cash money loans:

- A demand note dated February 26, 2014, executed by Dondero on behalf of HCMFA, as the maker, in the original principal amount of $4,000,000 in favor of Highland (the "2014 Note") (ROA.74314-74315).

- A demand note dated February 26, 2016, executed by Dondero on behalf of HCMFA, as the maker, in the original principal amount of $2,300,000 in favor of Highland (the "2016 Note," together with the 2014 Note, the "Pre-2019 Notes," and collectively with the Demand Notes and the Term Notes, the "Notes") (ROA.74317-74318).

On April 15, 2019, Dondero, acting on Highland's behalf, signed a letter (the "Acknowledgment Letter") agreeing that Highland would not demand payment on amounts owed by HCMFA before May 31, 2021. ROA.74273-74274; Second Klos

---

[4] The Term Note Obligors had remained current with all Annual Installment Payments as of each year-end 2017, 2018, and 2019. The 2019 Annual Installment Payments were made after Highland's bankruptcy filing in October 2019 and after the sale of MGM stock that occurred in November 2019, which is discussed further below.

Dec. ¶16 ROA.69205. It is undisputed that (a) HCMFA received cash for the Pre-2019 Notes; (b) between 2016 and 2021, HCMFA paid Highland nearly $4 million in principal and interest due under the Pre-2019 Notes;[5] (c) the remaining debt evidenced by the Pre-2019 Notes was outstanding and owed; (d) Highland received no consideration for the forbearance reflected in the Acknowledgement Letter; and (e) Highland nevertheless complied with the Acknowledgment Letter by not making a demand under the Pre-2019 Notes until it sent a letter (the "<u>Demand Letter</u>") on June 2, 2021. Second Klos Dec. ¶ 17 ROA.69205; ROA.74275-74288. HCMFA breached its obligations under the Pre-2019 Notes by failing to pay all remaining principal and interest due as set forth in the Demand Letter.[6] These facts are undisputed.

## E.  **<u>Highland Commences the Adversary Proceedings to Collect Under the Defaulted Notes</u>**

On January 22, 2021, Highland commenced an adversary proceeding by filing its complaint against each of the Obligors to collect under the defaulted Notes

---

[5] ROA.74273-74274.

[6] Contradicting all of its manufactured defenses, HCMFA paid interest on the Pre-2019 Notes in December 2021—*after* Highland sent the Demand Letter and commenced a separate action to collect on the Pre-2019 Notes. *See* ROA.74242 at 58:4-6 [confirm].

(collectively, the "Main Notes Litigation").[7] In its Original Complaints, Highland asserted claims for (a) breach of contract and (b) turnover by each Appellant for all accrued and unpaid principal and interest due under the Notes, plus Highland's costs of collection.

The Pre-2019 Notes were not included in the HCMFA Original Complaint because they were subject to the Acknowledgment Letter. On November 9, 2021, Highland sued HCMFA to collect under the Pre-2019 Notes (the "Second HCMFA Action") asserting the same breach of contract and turnover claims asserted in Highland's Original Complaints. The judgments entered in the Main Notes Litigation and the Second HCMFA Action were consolidated for purposes of this appeal.

**F.    Appellants Ignore the Indisputable, Overwhelming Evidence Contradicting All Defenses**

On December 17, 2021, after the close of discovery in the Main Notes Litigation, Highland moved for summary judgment on its breach of contract and turnover claims.[8] Highland subsequently moved for summary judgment against

---

[7] *See* Adv. Pro. No. 21-03003-sgj (the "Dondero Action"), Docket No. 1 (the "Dondero Original Complaint"); Adv. Proc. No. 21-03004-sgj (the "First HCFMA Action"), Docket No. 1 (the "HCMFA Original Complaint"); Adv. Pro. No. 21-03005-sgj (the "NexPoint Action), Docket No. 1 (the "NexPoint Original Complaint"); Adv. Proc. No. 21-03006-sgj (the "HCMS Action"), Docket No. 1 (the "HCMS Original Complaint"); and Adv. Proc. No. 21-03007-sgj (the "HCRE Action," and collectively with the Dondero Action, the First HCMFA Action, the NextPoint Action, and the HCMS Action, the "Main Notes Litigation"), Docket No. 1 (the "HCRE Original Complaint").  The forgoing are collectively referred to as the "Original Complaints."

[8]  *See* Adv. Proc. No. 21-03003-sgj at Docket No. 132 ROA.28573-28581; Adv. Proc. No. 21-03004-sgj at Docket No. 93 ROA.36994-37097; Adv. Proc. No. 21-03005-sgj at Docket No. 131

HCMFA on the Pre-2019 Notes in the Second HCMFA Action ROA.69147-69200 (collectively, the "Motions for Summary Judgment").[9] The Motions for Summary Judgment were based on indisputable, overwhelming evidence that Appellants simply ignore.

### 1. Highland's *Prima Facie* Case

#### a. *Prima Facie* Case Against Main Note Defendants

As the Bankruptcy Court found in the R&R that the District Court accepted, Highland established its *prima facie* case because (a) the Notes are valid, were exchanged for cash, and were signed by the Main Note Defendants and in Highland's favor, and (b) as of December 11, 2021, outstanding principal and unpaid interest was due under the Notes. ROA.28588-28589; ROA.28614-28622; ROA.28593; ROA.28589; ROA.28623-28628; ROA.28593; ROA.28590; ROA.28629-28640; ROA.28594; ROA.28590-28591; ROA.28641-28652; ROA.28591; ROA.28596-28599; ROA.28595; ROA.28592; ROA.28582-28660. Highland has been damaged by the Main Note Defendants' breach of the Notes in the amounts set forth in the R&R, exclusive of collection costs and interest that continues to accrue and are

---

ROA.46346-46354; Adv. Proc. No. 21-03006-sgj at Docket No. 129 ROA.55000-55008; Adv. Proc. No. 21-03007-sgj at Docket No. 124 ROA.62682-62690.

[9] After Appellants amended their Answers in the Main Notes Litigation to assert the Alleged Agreement defense, Highland amended its Complaints to add claims against Dondero, Nancy, and Dugaboy for fraudulent transfers, declaratory judgment, breach of fiduciary duty, and aiding and abetting fiduciary duty (collectively, the "Additional Claims"). The Additional Claims were not included in the Motions for Summary Judgment but will be pursued if the judgments are reversed on the basis that genuine disputes of material fact exist with respect to the Alleged Agreement defense.

required to be paid by the Demand Notes and the Term Notes. R&R at 36-38 ROA.34365-34367.

### b. *Prima Facie* Case Against HCMFA in Second HCMFA Action

The Pre-2019 Notes are valid, were exchanged for cash, and were signed by HCMFA in Highland's favor (Second Klos Dec. ¶¶4-5 ROA.69202-69203, Exhibit A, Exhibit B, ROA.69207-69209, 69210-69212), and, as of May 27, 2022, after giving effect to the Payments, the unpaid principal and accrued interest due under the 2014 Note was $2,151,130.84, and the unpaid principal and accrued interest due under the 2016 Note was $1,001,238.06, *Id.* ¶18 ROA.69205-69206. HCMFA breached its obligations under the Pre-2019 Notes by failing to pay Highland all amounts due and owing upon Highland's demand. Highland has been damaged by HCMFA's breach in the amounts set forth above which (a) continue to increase daily, and (b) do not include a calculation of collection costs and attorneys' fees, which are required to be paid under the Pre-2019 Notes.

### 2. The Obligors Always Treated the Notes as Valid, Enforceable Obligations, Not Subject to Discount or Defense

Every piece of documentary evidence created before the commencement of litigation—including audited financial statements, internal accounting records, e-mail communications, and bankruptcy filings—proves that the Notes are valid debt obligations enforceable without defense and the Obligors knew it. ROA.34346-34352 at 17-23 (citing evidence). Specifically, the following undisputed evidence

proves that the Obligors (a) knew all of the Notes existed; (b) treated the Notes as valid, enforceable obligations and as Highland's assets; and (c) never told anyone that the Notes might be unenforceable or were otherwise subject to any defense:

- All of the Notes were (a) provided to PwC, Highland's long-time outside auditors; (b) specifically described in Highland's audited financial statements; and (c) carried as assets on Highland's balance sheet with values equal to the accrued and unpaid principal and interest, without any offset or reservation of any kind (ROA.34346-34349 at 17-20);[10]

- Highland's audited financial statements were based on management representation letters signed by Dondero and Waterhouse, neither of whom ever disclosed the Alleged Agreements, HCMFA's Mutual Mistake Defense, or any other defense to PwC despite those defenses being material and Appellants having an affirmative obligation to do so under generally accepted accounting principles (*Id*. at ROA.34346);

- Dondero's failure to disclosure the Alleged Agreements to PwC breached his obligation to disclose, among other things, "transactions with related parties" (ROA.70710);

- Relying on their own financial statements, HCMFA and NexPoint jointly reported to the Retail Board in October 2020 (the "Retail Board Report") that they were obligated to pay Highland the amounts due under the HCMFA and NexPoint Notes, without setoff or reservation of any kind (*Id*. at 20-21 ROA.34349-34350);

- Waterhouse oversaw the preparation of those portions of the Retail Board Report stating that the HCMFA and NexPoint Notes were valid obligations due and owing to Highland;[11]

---

[10] Even the HCMFA Notes executed in May 2019—which HCMFA now contends were "signed by mistake" and "without authority"—were fully described in the "Subsequent Events" section of HCMFA's audited financial statements for the period ending December 31, 2018 (ROA.70066 at 39), and were carried as liabilities on HCMFA's *own* balance sheet. (SEALED EXHIBIT) ROA.70124 at 17; ROA.72312-72313 at 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3.

[11] *See* ROA.70072-70073; ROA.70075; ROA.70079-70080; ROA.70076-70077.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

- Without exception, Highland's contemporaneous books and records recorded the Notes (including the HCMFA Notes) as debts due and owing by each of the Obligors to Highland (ROA.34351-34352 at 22-23); and

- Throughout Highland's bankruptcy (both while Dondero controlled Highland and after), all of Highland's bankruptcy filings (nearly all of which were prepared and signed by Waterhouse) reported the Notes (including the HCMFA Notes) as assets of the Debtor's estate, without setoff or reservation of any kind (*Id*. at ROA.34352).

### 3. Recovery on the Notes Was a Significant Component of the Debtor's Plan Yet the Obligors Remained Silent on the Point Despite Lodging Other Objections

Appellants failed to disclose *any* of their purported defenses prior to confirmation of Highland's Plan. Their collective failure to disclose was not caused by any misunderstanding: Highland transparently put the world on notice that collection on the Notes was a key component of its proposed asset monetization plan, yet the only substantive issue the Obligors ever raised—despite lodging numerous, unrelated objections—was ultimate "collectability."[12]

Highland's disclosure statement (filed and approved before the Adversary Proceedings were commenced [Bankr. Docket No. 1473]) included financial projections and a detailed liquidation analysis (the "Projections"). The Projections enabled creditors to assess potential outcomes under the Debtor's proposed plan of reorganization (ROA.70781-70789) and expressly assumed, among other things,

---

[12] The Notes represented over 30% of the total recoveries projected to Class 8 claimholders under Highland's asset monetization plan and were Highland's second largest asset when considered collectively.

that "[a]ll demand notes are collected in the year 2021." *Id.* at ROA.70784 (Assumption C). Thus, even though Highland had not yet called the Demand Notes, the Obligors were on notice in November 2020, that the Debtor's Projections assumed all Demand Notes would be collected the following year.

As discussed above, the Term Note Obligors defaulted under the Term Notes on December 31, 2020, when they failed to make the required Annual Installment payments. By early February 2021, after commencing the Adversary Proceedings to collect on ***all*** of the Notes, Highland amended the Projections [Bankr. Docket No. 1875-1] and modified the assumption concerning the Notes to state "[a]ll demand notes are collected in the year 2021; 3 term notes defaulted and have been demanded based on default provisions; payment estimated in 2021." ROA.70792 (Assumption C) (the "<u>Assumption</u>"). Thus, before the confirmation hearing, the Obligors knew the Debtor's Projections, as amended by the Assumption, assumed that all amounts due under the Notes would be collected as part of the Plan.

During the confirmation hearing, James P. Seery, Jr. ("<u>Seery</u>"), Highland's court-approved CEO, testified (a) why the Debtor believed the Assumption was reasonable, and (b) how the commencement of the Adversary Proceedings impacted the Projections. On cross, Dondero's counsel asked questions about the Notes but never mentioned any defenses to enforcement. ROA 73589-73590 at 123:23-124:23, ROA.73594-73595 at 128:23-129:21, ROA.73651 at 185:8-15. In his closing

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

argument, Dondero's counsel again discussed the value of the Notes and raised questions of ultimate "collectability," but again failed to mention any defenses to enforcement. ROA.73986-73986.

Dondero and his entities objected to Highland's proposed Plan on numerous grounds. As this Court stated, they "fire[d] a bankruptcy-law blunderbuss." *In re Highland Cap, Mgmt., L.P.*, 48 F.4th 419, 423 (5th Cir. 2022). Yet, despite Appellants filing extensive objections, none objected to the Assumption that Highland would collect on all of the Notes or even suggested that any defenses to enforcement existed.[13] In light of Appellants' efforts to defeat confirmation of the Plan, it is inconceivable that Appellants would not have also objected to a material assumption upon which the economics of the Plan was premised. Appellants had every incentive to put their cards on the table and disclose their purported defenses during the Disclosure Statement and confirmation hearings. The only plausible explanation for Appellants' collective failure to disclose any of their "defenses" during the confirmation proceedings is that those defenses were not yet fabricated.

## G.    The Alleged Agreement Defense Is Meritless

The only evidence Appellants offer to support their Alleged Agreement defense are self-serving, unsubstantiated, and inconsistent statements by Dondero and his sister, Nancy, concerning secret, annual discussions during which they

---

[13] *See* Bankr. Docket Nos. 1661, 1667, and 1670, respectively.

allegedly agreed that Highland would forgive $70 million worth of notes "subject to conditions precedent." *See* ROA.74591-94; ROA.33754-33767.

No evidence exists to corroborate the Donderos' statements. There is not one document in the record or one witness not named "Dondero" that corroborates the existence of the Alleged Agreements. By contrast, a mountain of overwhelming, undisputed evidence corroborates the validity, existence, and enforceability of the Notes. Any notion of the Alleged Agreement is blatantly contradicted by the record.

### 1. The Alleged Agreement Defense Was Fabricated During Discovery

In his Original Answer, Dondero baldly asserted that "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes." ROA.70664 ¶ 40 (the "Alleged Agreement"). ***None*** of the corporate Obligors asserted the Alleged Agreement defense in their Original Answers and Dondero did not assert that the Alleged Agreement defense applied to the corporate Obligors' Demand Notes.[14]

During discovery, Highland asked Dondero to admit, among other things, that he had not paid taxes on the amounts Highland loaned to him but allegedly agreed not to collect. ROA.70671-70673 (Responses to RFAs 4, 8, and 12). Alerted to a fatal flaw in his defense, Dondero amended his Alleged Agreement defense to now

---

[14] *Compare* Dondero Action, Docket No. 6 (the "Dondero Original Answer") *with* HCFMA Action, Docket No. 6 (the "HCMFA Original Answer"); NexPoint Action, Docket No. 6 (the "NexPoint Original Answer"); HCMS Action, Docket No. 6 (the "HCMS Original Answer"); and HCRE Action, Docket No. 7 (the "HCRE Original Answer").

claim: "Plaintiff's claims should be barred because it was previously agreed that Plaintiff would not collect on the Notes **upon fulfillment of conditions subsequent**." ROA.70687 ("<u>Amended Answer</u>") ¶40 (emphasis added).

Shortly after serving his Amended Answer, Dondero served his *Rule 26 Initial Disclosures* (the "<u>Rule 26 Disclosures</u>"). In his Rule 26 Disclosures, Dondero specifically identified fifteen (15) "individuals likely to have discoverable information," **but his sister Nancy was not among them**. ROA.72268-72271.

Dondero then served his sworn *Objections and Answers to Highland Capital Management L.P.'s First Set of Interrogatories*. In response to an interrogatory requiring Dondero to identify "the person who entered into each [Alleged] Agreement on behalf of the Debtor," **Dondero identified himself, not his sister Nancy or Dugaboy**. ROA.70678 (Answer to Interrogatory 1).

In response to an interrogatory requiring Dondero to identify "every person who James Dondero believes has actual knowledge of each [Alleged] Agreement," Dondero identified five (5) individuals, including himself, but again, **Dondero's sister was not among them**, (*id.*) (Answer to Interrogatory 2), and none of those other people ever claimed to know about any Alleged Agreement. In the early versions of his affirmative defense, Dondero swore that he entered into the Alleged Agreements by himself with himself, simultaneously acting on behalf of himself and Highland.

Dondero did not identify Nancy as the person who allegedly bound Highland to the Alleged Agreements until later in discovery when he changed his story yet again.[15] After doing so, each of the Demand Note Obligors (except for HCMFA in the First HCMFA Action) fell in line and amended their respective Answers to adopt Dondero's re-jiggered Alleged Agreement defense, claiming that they were not liable because Highland somehow (through Dugaboy) agreed not to collect on the Demand Notes "upon fulfillment of conditions subsequent as a form of compensation to Mr. Dondero."[16]

After months of maneuvering, the Demand Note Obligors made a convenient, final substantive change to the Alleged Agreement defense: now, the Demand Notes would be forgiven not only upon the satisfaction of "conditions subsequent," but also if "certain portfolio companies" were sold "on a basis outside of James Dondero's control."[17] The final version of the Alleged Agreement defense provided:

> Plaintiff's claims are barred … because prior to the demands for payment Plaintiff agreed that it would not collect the Notes upon fulfillment of conditions subsequent. Specifically, sometime between December of the year in which each note was made and February of the

---

[15] Nancy allegedly acted in her capacity as Dugaboy's Trustee, Dondero's family trust that purportedly held a majority of certain of the limited partner interests in Highland. *See* ROA.69939 ¶82. As the District Court found, neither Nancy nor Dugaboy were authorized to bind Highland to the Alleged Agreements. *See infra* at Section G.4.

[16] *See* ROA.69705-69706 (NexPoint's First Amended Answer) ¶ 42; ROA.69686 (HCMS's First Amended Answer) ¶ 56; ROA.69752 (HCRE's Amended Answer) ¶ 99.

[17] HCMFA adopted the Alleged Agreement defense *verbatim* in the Second HCMFA Action. *See* ROA.74398 ¶ 41. But after Dondero realized that he (and not Nancy) was Dugaboy's Trustee when the 2014 Note was executed, he had to modify his story yet again, admitting that he entered into the Alleged Agreement concerning the 2014 Note with himself. ROA.74314-74315.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

following year, [] Nancy Dondero, as representative for a majority of the Class A shareholders of Plaintiff agreed that Plaintiff would forgive the Notes if certain portfolio companies were sold for greater than cost **or on a basis outside of Defendant James Dondero's control**. The purpose of this agreement was to provide compensation to Defendant James Dondero, who was otherwise underpaid compared to reasonable compensation levels in the industry, through the use of forgivable loans, a practice that was standard at HCMLP and in the industry. This agreement setting forth the conditions subsequent to demands for payment on the Notes was an oral agreement; however, Defendant [ ] believes there may be testimony or email correspondence that discusses the existence of this agreement that may be uncovered through discovery in this Adversary Proceeding.

ROA.69937 ¶ 82 ("Dondero's Answer") (emphasis added).[18] This language was inserted because, by mid-2021, the so-called "portfolio companies" could **only** be sold "outside of James Dondero's control" since Highland was controlled by the Bankruptcy Court-appointed Independent Board and its asset monetization plan had been confirmed. These facts are not in dispute.

### 2.   The Donderos' Post-Commencement Statements Concerning the Alleged Agreements Are Not Corroborated

No evidence corroborates the Alleged Agreement defense, further supporting the District Court's conclusion that no reasonable trier of fact could believe it. As a threshold matter, "*no document was ever uncovered or produced in discovery to establish, memorialize, or reflect the existence or terms of the alleged 'oral*

---

[18] *See also* ROA.69719-69720 ¶ 83 ("NexPoint's Answer"); ROA.69735-69736 ¶ 97 ("HCMS's Answer"); and ROA.69752 ¶ 99 ("HCRE's Answer").

***agreement'***." ROA.34354 at 25  (emphasis in original). The undisputed evidence established that:

- Neither Dugaboy nor Nancy (a) ever made a list of the promissory notes that are the subject of the Alleged Agreements; or (b) is otherwise aware of any writing that identifies the promissory notes subject to Alleged Agreement (ROA.71203 at 178:25-180:7, 180:24-181:6);

- The terms of the Alleged Agreements were never reduced to writing (ROA.69823 (Nancy Responses to RFAs 7-8); ROA.69826 (Nancy Responses to Interrogatories 3-4); ROA.69839 (Dugaboy Responses to RFAs 7-8); ROA.69842 (Responses to Interrogatories 3-4); ROA.71212 at 217:2-17);

- Dondero admitted that (a) he never wrote down a list of the Notes that are subject to the Alleged Agreements; (b) he is unaware of any document that was created prior to the commencement of the Adversary Proceedings that identified the Notes subject to the Alleged Agreements; and (c) no document was created prior to the commencement of the Adversary Proceeding that memorialized the terms of the Alleged Agreements (ROA.69806 (Response to RFA 7); ROA.71103 at 28:24-29:12).

<u>The Alleged Agreements were never disclosed</u>. Dondero and Nancy admitted that they never disclosed the existence of the Alleged Agreements to anyone until ***after*** the Adversary Proceedings were commenced (R&R at 28-29 ROA.34357-34358):

- No one participated in the discussions concerning the Alleged Agreements other than Dondero and his sister (ROA.71206 at 190:16-191:17);

- Neither Nancy nor Dugaboy ever disclosed the existence or terms of the Alleged Agreements to PwC, Waterhouse, Okada, any creditor, or the Bankruptcy Court (ROA.69822-69826 (Nancy Responses to RFAs 1-6, 9-16 and Responses to Interrogatories 1-2); ROA.69838-69842 (Dugaboy Responses to RFAs 1-6, 9-16 and Responses to Interrogatories 1-2)); and

- Dondero never disclosed the existence or terms of the Alleged Agreements to PwC, Okada, or the Bankruptcy Court (ROA.69805-69808 (Responses to RFAs 1-2, 5-7, 11-14)).[19]

<u>Dondero could not identify material terms of the Alleged Agreements</u>. In his deposition, Dondero could not (a) describe material terms of the Alleged Agreements or (b) recall the maker, date, or principal amount of any Note subject to the Alleged Agreements, without relying on a document prepared by his counsel (ROA.71099-71103 at 13:4-28:22). Since the Alleged Agreements were oral, Dondero's inability to identify the Notes subject to the Alleged Agreements is fatal since other notes existed that were paid in whole or in part prior to the Petition Date.[20]

<u>Dondero caused MGM stock to be sold in November 2019, yet failed to declare the Notes forgiven or disclose the Alleged Agreements</u>. Under the Alleged Agreement defense, all Notes would be forgiven if Dondero sold one of three portfolio companies—Trussway, Cornerstone, or MGM—above cost. ROA.69939 ¶82. In November 2019 (after the Petition Date but while Dondero controlled Highland), Dondero caused the sale of a substantial interest in MGM for $123.25

---

[19] Dondero now contends that he told Waterhouse about the Alleged Agreements. ROA.69805 (Responses to RFAs 3 and 4). But in painful testimony, Waterhouse admitted that (a) he learned of the existence of the Alleged Agreements from his counsel the day before his deposition, and (b) he had no knowledge of any term of the Alleged Agreements other than that they were subject to "milestones" that he could not identify. ROA.71349-71351 at 65:5-72:14; ROA.71354 82:19-84:7.

[20] *See, e.g.,* ROA.70120-70122 (January 18, 2018 note executed by Mr. Dondero in the principal amount of $7.9 million that was paid off in full); Adv. Pro. 21-03082-sgj, Docket No. 1 ROA.69073-69081 (Exhibit 1, the 2014 Note that was partially paid) ROA.69082-69084 (Exhibit 2, the 2016 Note that was partially paid) ROA.69085-69087.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

million (an amount above cost), a portion of which was for the Debtor's interest in a fund. Yet, Dondero failed to declare the Notes forgiven or disclose the existence of the Alleged Agreements, despite having every incentive to do so. ROA.72554-72555 ¶29-30; ROA.73419 ¶14; ROA.73427 ¶1.

*Nancy could not enter into the Alleged Agreements*. Under the circumstances, Nancy was incapable of entering into the Alleged Agreements due to her utter lack of knowledge or inquiry concerning any fact or issue relevant to the Alleged Agreements and her abject failure to negotiate any term of any Alleged Agreement. For example, Nancy:

- never (a) made a counterproposal; (b) negotiated any aspect of the Alleged Agreements; (c) asked Dondero how he selected the portfolio companies; (d) inquired as to whether Dondero already had a duty to maximize value; (e) rejected any aspect of Dondero's proposal; or (f) rejected or pushed back on Dondero's proposal that all of the Notes would be forgiven if any of the portfolio companies were sold by a third party (ROA.71207-71208 at 194:16-19, 195:14-199:15);

- had no meaningful knowledge, experience, or understanding of (a) Highland or its business, (b) the financial industry, (c) executive compensation matters, or (d) her brother's compensation or whether he was "underpaid compared to reasonable compensation levels in the industry" (ROA.71169 at 42:22-43:8, ROA.71170-71173 at 48:7-61:9; ROA.71211-71212 at 211:8-216:21);[21]

---

[21] The only information Nancy had concerning Dondero's compensation from Highland was that he "was not highly paid" and that in recent years, "his salary has been roughly less than a million, 500, 700,000 somewhere in that ballpark." ROA.71171 at 51:11-22. This information (supposedly provided by her brother) was false. ROA.70413-70414 (2016 total compensation of $2,287,175); ROA.70144-70145 (2017 total compensation of $4,075,324); ROA.70146-70147 (2018 total compensation of $4,194,925); and ROA.70148-70149 (2019 total compensation of $8,134,500).

- never reviewed Highland's financial statements, never asked to see them, and knew nothing about Highland's financial condition prior to the Petition Date (ROA.71173-71174 at 61:25-63:13);

- did not know of Highland's "portfolio companies" except for those her brother identified, and as to those, Nancy did not know the nature of Highland's interests in the portfolio companies, the price Highland paid to acquire those interests, or the value of the portfolio companies (ROA.71174-71178 at 63:18-80-22; ROA.71210-71211 at 208:24-210:13);

- never saw a promissory note signed by Dondero, any other officer or employee of Highland, or any "affiliate" of Highland (ROA.71179 at 83:14-84:8; ROA.71182 at 95:3-16; ROA.71183 at 99:20-100:10; ROA.71187 at 115:11-116:4; ROA.71190 at 127:13-128:4; ROA.71193 at 140:15-141:22; ROA.71203 at 180:18-23);

- learned (falsely, as shown below) from her brother that Highland allegedly had a "common practice" of forgiving loans but had no actual knowledge or information concerning any loan that Highland made to an officer, employee, or affiliate that was actually forgiven and made no effort to verify her brother's statement (ROA.71179-71181 at 84:9-92:3; ROA.71183-71184 at 100:11-103:8); and

- knew nothing about HCMFA, HCMS, or HCRE (the corporate Obligors whose Demand Notes are subject to the Alleged Agreement defense), including (a) the nature of their businesses, (b) their relationships with Highland, (c) their financial condition, or (d) the purpose of the loans made to them by Highland, and their use of the proceeds (ROA.71184-71187 at 103:19-115:10; ROA.71188-71190 at 119:5-127:7; ROA.71190-71193 at 129:5-140:14.[22]

Highland did not have "standard practice" of forgiving loans. The Demand

Note Obligors stubbornly cling to their contention that Highland had a "standard

---

[22] Dondero retained Alan Johnson ("Johnson") as an executive compensation expert. Johnson has experience advising boards, compensation committees, and other parties on issues concerning loan forgiveness transactions. Based on his expertise, Johnson essentially agreed that no one could have responsibly entered into the Alleged Agreements on behalf of Highland under the circumstances. *See* ROA.71245-71260 at 12:3-73:17.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

practice" of using "forgivable loans." ROA.69939 ¶82. But as the District Court found, this contention is false. (ROA.71272-71289 at 119:14-189:21; *Id.* at ROA.71289-71290 at 189:24-192:10; *See also* ROA.71060-71062 at 422:18-428:14). According to Dondero, Highland disclosed to PwC all loans of a material amount that Highland ever forgave. ROA.71061 at 426:8-427:15. During his deposition, Johnson reviewed Highland's audited financial statements for each year from 2008 through 2018 (ROA.71272-71289 at 119:14-189:21) and concluded that (a) ***Highland has not forgiven a loan to anyone in the world since 2009*** (*i.e.*, for more than a decade before Highland commenced the Adversary Proceedings); (b) the largest loan Highland has forgiven since 2008 was $500,000; (c) Highland has not forgiven any loan to Dondero since at least 2008; and (d) since at least 2008, Highland has never forgiven any loan that it extended to any affiliate. ROA.71289-71290 at 189:24-192:10; ROA.71060-71062 at 422:18-428:14.[23]

Finally, Dondero admitted that Highland ***never*** made a loan to him, any affiliate owned or controlled by him, or Okada that was ever forgiven. ROA.69805-69808 (Responses to RFAs 15-17).

---

[23] In discovery, Highland produced tax returns for the period 2008 through 2018; that is why Highland characterizes the pertinent facts as being "since at least" 2008—more than a decade before the Petition Date. No evidence exists proving that Highland forgave a loan to any person or entity in the world before 2008. In any event, given the undisputed fact that Highland never forgave a loan to an employee or affiliate in the decade before the Main Notes Litigation was commenced, Appellants' obstinate insistence that Highland had a "standard practice" for forgiving loans is indefensible.

### 3. Even if the Alleged Agreements existed, they are Unenforceable for Lack of Consideration

Dondero founded Highland and used Highland to support his other businesses, including the Advisors, HCRE, and HCMS. No reasonable trier of fact could conclude that Highland (a) needed to enter into the Alleged Agreements to retain or motivate Dondero or (b) received anything of value in exchange for agreeing to forgive over $50 million principal amount evidenced by valid promissory notes if either (i) Dondero sold one of the three portfolio companies at a dollar above cost or (ii) the portfolio companies were sold by a third party. Yet, according to Nancy, "motivating" Dondero to sell one of three assets at a single dollar above cost was the only "benefit" that Highland was expected to receive under the Alleged Agreements. ROA.71213-71214 at 221:2-225:7.[24]

Fatally, by the time the Alleged Agreements were finally concocted and revealed, Highland could not receive even any theoretical "benefit" because the so-called portfolio companies could *only* be sold on a "basis outside of Defendant James Dondero's control."[25] Nancy admitted that she did not know, and had no

---

[24] Appellants suggest that Highland also benefitted by making loans instead of paying compensation to Dondero. (Br. at 49-50). But that makes no sense because (a) regardless of form, Highland still parted with the cash, (b) the purported "conditions subsequent" (*i.e.*, if Dondero sold one of three assets above cost or if the assets were sold by a third party) were so easily achievable that Highland had no realistic prospect of recovering the money; and (c) the corporate Obligors used the loan proceeds to make investments, not to pay Dondero.

[25] When the Alleged Agreement defense was first asserted in 2021, Highland was controlled by the Independent Board. Seery, as CEO, has managed Highland (subject to oversight by Highland's Claimant Oversight Board) since Highland's plan went effective on August 11, 2021.

reason to expect, that Highland would benefit from the sale of the portfolio companies under these circumstances—and even insisted that the Agreements would apply if the third party sold the portfolio companies "at a price substantially below cost." ROA.71208-71209 at 201:24-203:11; ROA.71215 at 227:17-229:14.

### 4. <u>Dugaboy Lacked Authority to Enter Into the Alleged Agreements</u>

Dugaboy had no authority under Highland's Limited Partnership Agreement (the "<u>LPA</u>") to enter into binding agreements.

Section 3.10(a) of the LPA provides, in relevant part, that "[t]he General Partner [of Highland] and any Affiliate of the General Partner shall receive no compensation from the Partnership for services rendered pursuant to this Agreement or any other agreements unless approved by a Majority Interest …." ROA.69906. Thus, while the Majority Interest, *i.e.*, Dugaboy, could *approve* a party's compensation, Dugaboy was not authorized to negotiate or bind Highland to an agreement without Highland's knowledge or consent.[26]

This limitation is consistent with general limited partnership law: Under Delaware law, a limited partner is generally prohibited from acting for the partnership. *In re El Paso Pipeline, L.P. Derivative Litig.*, 132 A.3d 67, 83 n.5 (Del. Ch. 2015) (*citing* Martin I. Lubaroff & Paul M. Altman, *Delaware Limited*

---

[26] Given Dondero's obvious conflict of interest, he could not have lawfully bound Highland either. Highland asserted the Additional Claims for these reasons, among others.

*Partnerships* § 1.2 (Supp. 2015)) ("Typically, the general partners conduct the day-to-day business and affairs of the limited partnership and are involved in controlling the management …. Generally, a limited partner does not participate in the control of the business of the partnership.") This principle is codified in Section 4.1(a) of the LPA, which vests Highland's management and governance "exclusively" in its general partner. ROA.69907.

## H.    HCMFA's "Mutual Mistake" Defense Is Meritless

There is no dispute that on May 2 and May 3, 2019, (a) Highland loaned $7.4 million to HCMFA, and (b) two promissory notes were contemporaneously created in favor of Highland that bore Waterhouse's signature and identified HCMFA as the maker (together, "2019 Notes"). Instead of relying on the Alleged Agreement defense, HCMFA seeks to dodge its obligations under the 2019 Notes by contending that they are "void" or "unenforceable" for "lack of consideration," "mutual mistake," and for the "lack of authority from [HCMFA] to Waterhouse to execute the same for [HCMFA]." ROA.69696 ¶47 (the "Mutual Mistake" defense).[27]

HCMFA's Mutual Mistake defense is premised on its contention that in March 2019, Highland made a "mistake in calculating" the net asset value ("NAV") of

---

[27] HCMFA's Mutual Mistake Defense was born out of necessity. HCMFA could not assert the Alleged Agreement defense because the 2019 Notes were executed in May 2019 and (as finally articulated) each Alleged Agreement was supposedly entered "sometime between December of the year in which each note was made and February of the following year." *See, e.g.*, ROA.69937 ¶ 82. Because Highland filed for bankruptcy in October 2019, Dondero and Dugaboy would have needed Bankruptcy Court approval to enter into an Alleged Agreement with respect to the 2019 Notes—and that never happened.

certain securities that Highland Global Allocation Fund ("HGAF")[28] held (the "NAV Error"), and that the $7.4 million total that was loaned by Highland to HCMFA was supposed to be "compensation" for the mistake, not a loan. Like the Alleged Agreement defense, no evidence corroborates HCMFA's "farfetched" defense, and a mountain of evidence directly contradicts it such that no reasonable jury could ever adopt it.[29]

1. **HCMFA Always Treated the 2019 Notes as Valid, Enforceable Obligations, not Subject to Discount or Defense**

The undisputed evidence established that until Highland commenced the Adversary Proceedings, HCMFA always treated the 2019 Notes as valid, enforceable obligations owing to Highland. ROA.34346-34352 (citing evidence).

The following evidence proves that HCMFA (a) knew the 2019 Notes existed and were exchanged for cash loans, (b) treated the 2019 Notes as valid, enforceable obligations and as Highland's assets, and (c) never told anyone that the 2019 Notes were signed by mistake or without authority or might otherwise be unenforceable:

- Waterhouse had actual and apparent authority to sign the 2019 Notes as evidenced by the scope of his duties and HCMFA's corporate documents expressly authorizing him to "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the General Partner [of

---

[28] HGAF was (and still is) a mutual fund advised by HCMFA.

[29] HCMFA also sought leave to amend its answer to assert, in the alternative, that Waterhouse "did not actually sign the [HCMFA] Notes." (the "Barred Defense") ROA.35190. The Bankruptcy Court denied leave to assert the Barred Defense, finding that any such defense was futile.

HCMFA]" (ROA.70073; ROA.71339-71340 at 25:22-26:3, ROA.71369 at 143:24-144:20; ROA.71373 at 158:2-161:2);[30]

- Waterhouse received contemporaneous e-mails from his subordinates informing him that the $7.4 million being transferred from Highland to HCMFA was being booked as "loans" subject to promissory "notes" (ROA.70154-70157; ROA.70160-70161);[31]

- The 2019 Notes were (a) provided to PwC, (b) fully described in the "Subsequent Events" section of Highland's and HCMFA's audited financial statements for the period ending December 31, 2018, and (c) were carried as liabilities on HCMFA's *own* balance sheet (ROA.70066; ROA.70124; ROA.72312-72313 at 49:19-50:2, 54:6-9, 54:22-55:8, 55:23-56:3, 56:20-59:3);

- Highland's audited financial statements were based on management representation letters signed by Dondero and Waterhouse, neither of whom ever disclosed HCMFA's Mistake Defense to PwC despite having an affirmative obligation to do so under generally accepted accounting principles (*Id*. at ROA.72313);

- In a report prepared by Waterhouse, HCMFA reported to the Retail Board in October 2020 (the "Retail Board Report") that HCMFA was obligated to pay Highland the amounts due under the 2019 Notes and never told anyone that its report was wrong (ROA.70169 at 2; ROA.72329-72330 at 125:18-127:2);

- Without exception or caveat, the 2019 Notes were included as assets of Highland's estate in dozens of schedules and reports signed by Waterhouse and filed with the Bankruptcy Court.

---

[30] Waterhouse regularly signed documents binding the various entities for which he served, including some of the other promissory notes at issue in this appeal and the Shared Services Agreement NexPoint relies upon as part of its defense to Highland's collection action. *See* ROA.69408-69409; ROA.69411-69412 (promissory notes executed by Waterhouse on behalf of HCMS); ROA.73446-73465 (Shared Services Agreement executed on behalf of NexPoint).

[31] These e-mails were sent to "Corporate Accounting," an e-mail group that Highland maintained and that included Waterhouse. ROA.72438 at 111:6-112:7.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

## 2. The "Mutual Mistake" Defense was Fabricated During Litigation

The evidence also proves that HCMFA's Mutual Mistake defense was fabricated for litigation purposes:

- No contemporaneous document exists establishing that (a) Highland caused the NAV Error, (b) HCMFA expected or demanded to be "compensated" by Highland for the NAV Error, or (c) Highland accepted responsibility for the NAV Error or agreed to pay "compensation."

- HCMFA told the Board of HGAF that *HCMFA caused the NAV Error* without ever mentioning Highland (ROA.72262-72264);

- HCMFA filed an insurance claim arising from the NAV Error and recovered almost $5 million (ROA.72331-72336 at 133:14-150:22);

- HCMFA never informed the insurance carrier that Highland caused the NAV Error or that it had received the $7.4 million loan from Highland as "compensation" for its alleged error (ROA.72336 at 150:3-22); and

- During an internal investigation conducted long before Highland demanded payment under the 2019 Notes, Waterhouse "obviously disagreed" with the assertion that any mistake had been made and insisted that PwC required notes (like the 2019 Notes) to substantiate intercompany transfers (ROA.72370 at 6:3-16, 7:10-13; ROA.72371 at 12:10-13:3; ROA.72374 at 24:18-25:12; ROA.72381-72383 at 52:15-59:16; ROA.72382 at 56:8-23; ROA.12383 at 61:7-24; ROA.72386 at 71:4-20).

## I. Other Affirmative Defenses Asserted

### 1. The "Prepayment" Defense Is Meritless

The Term Note Obligors assert that they did not default by failing to make the December 31, 2020 Annual Installment payment because they "prepaid." ROA.71045-71046 at 362:12-366:10, 71047 370:6-11, 71052 389:10. There is no dispute that the Term Note Obligors (a) were required to make Annual Installments

and (b) had the right to make "prepayments." ROA.74036 at § 2.1, 3. The only question is how "prepayments" were to be applied. Section 3 of the Term Notes provides the answer:

> 3.  <u>Prepayment Allowed; Renegotiation Discretionary</u>.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  **Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.**

*Id.*

This section clearly requires that "prepayments" be applied "first to unpaid accrued interest" and then to "unpaid principal." Consequently, the Term Note Obligors' contention that "prepayments" should have been held in reserve to satisfy future obligations is baseless. The unrefuted summary judgment evidence dispels of any argument that prepayments applied as required by the Term Notes may have averted any defaults. ROA.34362 at 33 (citing Klos Dec. ROA.69202-69205 ¶¶ 3-14; ROA.69214 (Loan Summaries)).

In fact, the Term Note Obligors knew that the Annual Installment payments were due on December 31, 2020, notwithstanding any prior "prepayment" because Waterhouse was provided with a 13-week forecast for the period beginning December 14, 2020 showing that payments were due on the Notes during the week of December 28. Klos Dec. ROA.28587 ¶12 and ROA.28613.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

And the Term Note Obligors also knew they defaulted by failing to make the Annual Installment payments that were due on December 31, 2020, because they attempted to cure the defaults with untimely payments tendered the following month. As the Term Notes show, the makers had no legal right to "cure" their defaults. ROA.34362 at 33 (citing ROA.28781-28788; ROA.30493-30495; ROA.30500).

## 2. The "Negligence" Defense Is Meritless

The Term Note Obligors also assert that any default under the Notes was the "result of [Highland's] own negligence, misconduct, breach of contract" under a certain "shared services" agreement. ROA.69719 ¶80. *See also* ROA.69686 ¶¶54-55; ROA.69752 ¶¶97-98.

NexPoint and Highland entered into an *Amended and Restated Shared Services Agreement* effective as of January 1, 2018 ("NexPoint's SSA"). ROA.73446-73465 (signed by Waterhouse on behalf of both parties). Article II of NexPoint's SSA required Highland to provide "assistance and advice" with respect to certain specified services. None of the services authorized Highland to control NexPoint's bank accounts or required Highland to effectuate payments on behalf of NexPoint without receiving direction from an authorized representative of NexPoint. In fact, Article II of NexPoint's SSA expressly provided that "for the avoidance of doubt . . . [Highland] shall ***not*** provide any advice to [NexPoint] or perform any duties on behalf of [NexPoint], other than the back- and middle office services

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

contemplated herein, with respect to (a) the general management of [NexPoint], its business or activities . . . ." ROA.73449-73451 at § 2.02 (emphasis added).

NexPoint's SSA expressly curtailed Highland's authority to act on NexPoint's behalf:

> Section 2.06 Authority. [Highland's] scope of assistance and advice hereunder is ***limited to the services specifically provided for in this Agreement. [Highland] shall not assume or be deemed to assume any rights or obligations of [NexPoint] under any other document or agreement to which NexPoint is a party***. . . . [Highland] shall not have any duties or obligations to [NexPoint] unless those duties and obligations are specifically provided for in this Agreement (or in any amendment, modification or novation hereto or hereof to which [NexPoint] is a party.

*Id*. § 2.06, Appx. 4170 (emphasis added).

Thus, under NexPoint's SSA, Highland had no duty (and no right) to effectuate banking transactions without NexPoint's authority.[32] As Waterhouse confirmed:

> Q:  Do you know if anybody ever instructed Highland's employees to make the payment that was due by NexPoint at the end of the year?
>
> A:  Did anyone instruct Highland's employees to make that payment?
>
> Q:  Correct.
>
> A:  Anyone – not that I'm aware.

---

[32] This is not the first time the District Court has rejected NexPoint's attempt to impose non-existent obligations on Highland under the NexPoint SSA. *See Memorandum Opinion and Order*, Case No. 3:22-cv-2170-S, Docket No. 35 at 9-11 (Feb. 28, 2024) (affirming Bankruptcy Court's determination that Highland had no affirmative duty under the NexPoint SSA to unilaterally modify payments due under a separate agreement between them).

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

Q: . . . [Were] any of Highland's employees authorized to effectuate the payment on behalf of NexPoint that was due at the end of the year without getting approval from either you or Mr. Dondero?

A: They had the – they had the ability to make the payment, but they didn't – you know, that – that payment needed to be approved.

ROA.74128-74129 at 381:21-382:16.[33] But Waterhouse went even further, testifying that ***Dondero instructed him not to make the payment due on December 31, 2020***. ROA.71431 at 390:4-392:17. In sum, Highland had no contractual obligation to make the Annual Installment due at the end of 2020, but even it did, the failure to do so lies with Dondero's explicit direction to Waterhouse that the payment not be made.

HCRE's and HCMS's "negligence" defense fails for an additional reason: as the District Court found, there was no admissible evidence that HCMS and HCRE ever had a shared service agreement with Highland. ROA.34363 at 34 n. 30.[34]

## ARGUMENT

### A. <u>Legal Standard</u>

This Court reviews a district court's grant of summary judgment *de novo*. *Brown v. City of Houston, Tex.*, 337 F.3d 539, 540 (5th Cir. 2003). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to

---

[33] Dondero also admitted that Highland was never instructed to make the Annual Installment payment due in December 2020. ROA.71070 at 462:16-463:9.

[34] In fact, unlike NexPoint, HCMS and HCRE never referred to "[Highland's] own negligence, misconduct, [and] breach of contract" in its affirmative defenses, instead vaguely asserting defenses of estoppel and waiver. *Compare* ROA.69719 ¶80 (NexPoint's "negligence" defense) *with* ROA.69686 ¶¶54-55 (HCMS's defenses) and ROA.69752 ¶¶97-98 (HCRE's defenses).

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

"A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Alton v. Texas A&M University*, 168 F.3d 196, 199 (5th Cir. 1999). The moving party meets its initial burden of showing there is no genuine issue for trial by "point[ing] out the absence of evidence supporting the nonmoving party's case." *Latimer v. Smithkline & French Laboratories,* 919 F.2d 301, 303 (5th Cir.1990); *see also In re Magna Cum Latte, Inc.*, 07-31814, 2007 WL 3231633, at *3 (Bankr. S.D. Tex. Oct. 30, 2007) ("A party seeking summary judgment may demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) the absence of a genuine issue of material fact."). "Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown*, 337 F.3d at 541.

"Ordinarily, suits on promissory notes provide 'fit grist for the summary judgment mill.'" *Resolution Tr. Corp. v. Starkey*, 41 F.3d 1018, 1023 (5th Cir. 1995) (quoting *FDIC v. Cardinal Oil Well Servicing Co.*, 837 F.2d 1369, 1371 (5th Cir.1988)); *Looney v. Irvine Sensors Corp.*, CIV.A.309-CV-0840-G, 2010 WL 532431, at *2 (N.D. Tex. Feb. 15, 2010) ("Suits on promissory notes are typically well-suited for resolution via summary judgment."). To prevail on summary

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

judgment for breach of a promissory note under Texas law, the movant need only establish (a) the note in question, (b) that the non-movant signed the note, (c) that the movant was the legal owner and holder thereof, and (d) that a certain balance was due and owing on the note. *Resolution*, 41 F.3d at 1023; *Looney*, 2010 WL 532431, at *2-3; *Magna Cum Latte*, 2007 WL 3231633, at *15.

"If the moving party carries [their] initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of genuine issue of material fact." *Latimer*, 919 F.3d at 303; *Nat'l Ass'n of Gov't Employees v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994) ("To withstand a properly supported motion for summary judgment, the nonmoving party must come forward with evidence to support the essential elements of its claim on which it bears the burden of proof at trial."). "This showing requires more than some metaphysical doubt as to the material facts." *Latimer*, 919 F.3d at 303 (internal quotations omitted); *Hall v. Branch Banking*, No. H-13-328, 2014 WL 12539728, at *1 (S.D.Tex. Apr. 30, 2014) ("[T]he nonmoving party's bare allegations, standing alone, are insufficient to create a material dispute of fact and defeat a motion for summary judgment."); *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) ("The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.") (internal quotations omitted); *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

1982) ("While in considering a motion for summary judgment, a court must inspect the entire record and draw all reasonable inferences in favor of the party opposing the motion … the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact.")

"Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton*, 168 F.3d at 199. In other words, the question is not whether there exists literally *any* evidence, *i.e.*, "a scintilla or less," but "***whether the nonmovant could, on the strength of the record evidence, carry the burden of persuasion with a reasonable jury***." *Armstrong v. City of Dallas*, 997 F.2d 62, 66 n. 12 (5th Cir.1993) (emphasis added). In sum, "[s]ummary judgment is appropriate when the record does not contain evidence that would lead a reasonable jury to find in favor of the non-moving party." *BMG Music v. Martinez*, 74 F3d 87, 89 (5th Cir. 1996).

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

**B.** **The District Court Correctly Held That No Genuine Dispute of Material Fact Regarding the Non-Existence of the Alleged Agreements**

    **1.** **No Reasonable Jury Could Find that the Alleged Agreements Exist Based on the Donderos' Self-Serving and Unsubstantiated Statements in the Main Notes Litigation**

Appellants contend that the Dondero Declarations were sufficient to defeat summary judgment, (Br. at 29-41),[35] insisting that the "self-serving" Dondero Declarations (i) "state facts, not mere legal conclusions," (*id.* at 29); and (ii) that Dondero and Nancy's testimony is "more than sufficient to show" that the Alleged Agreement exists (*id.* at 43). As the District Court found, these self-serving and uncorroborated statements are not the type of "probative evidence required" to defeat summary judgment, especially "in the face of conflicting probative evidence." *Kariuki v. Tarango*, 709 F.3d 495, 505 (5th Cir. 2013).[36]

The cases Appellants rely on (Br. at 43-44) are easily distinguishable. *See In re Palms at Water's Edge, L.P.*, 334 B.R. 853, 858 (Bankr. W.D. Tex. 2005) (a meeting of the minds "can be inferred from the parties' conduct and their course of dealing"); *Franklin v. Regions Bank*, CV 5:16-1152, 2021 WL 867261, at *4 (W.D.

---

[35] Cites to "Br." refer to *Appellants Opening Brief* [Document: 80].

[36] *See also BMG*, 74 F.3d at 91 (affirming summary judgment for plaintiffs where "the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant"); *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001) (affirming summary judgment for recovery under promissory note where defendant's only evidence to rebut plaintiff's *prima facie* case consisted of "self-serving allegations," which "are not the type of significant probative evidence required to defeat summary judgment") (internal quotations omitted).

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

La. Mar. 8, 2021) (oral agreement was supported by ample corroborating evidence).[37] Here, unlike in those cases, Appellants have failed to adduce ***any*** evidence from which the existence of the Alleged Agreements can be "inferred from the circumstances" or the parties' "course of dealing."[38]

Appellants' contention that the Dondero Declarations, even if "self-serving," create genuine disputes of material fact is based on equally distinguishable case law. In *Lester v. Wells Fargo Bank, N.A.*, 805 Fed. Appx. 288 (5th Cir. 2020), the court held that the non-movant's statement that she mailed a written "opt out" to a proposed settlement was sufficient to create to "genuine dispute of material fact." The Court noted "[d]etermining whether a particular affidavit is vague or conclusory is necessarily a fact-bound analysis that will depend on the facts and claims at issue. Broad legal or factual assertions in an affidavit that are unsupported by specific facts

---

[37] *See also Haws & Garrett General Contractors, Inc. v. Gorbett Bros. Welding*, 480 S.W.2d 607 (Tex. 1972) (existence of contract can be "inferred from the circumstances" based on the "conduct of one party"); *Al-Saud v. Youtoo Media, L.P.*, 3:15-CV-3074-C, 2017 WL 3841197 (N.D. Tex. March 15, 2017) (corroborating evidence offered to support defense to breach of contract claim); *Fisher v. Blue Cross and Blue Shield of Tex., Inc.*, 3:10-CV-2652-L, 2015 WL 5603711, at *10 (N.D. Tex. Sept. 23, 2015) (denying summary judgment where evidence of the parties' course of dealing might enable a find-finder to infer the existence of an implied contract); *Honore v. Douglas*, 833 F.2d 565 (5th Cir. 1987) (denying summary judgment where non-movant offered corroborating evidence including party admissions and other testimonial evidence).

[38] Appellants' other cases are inapplicable because the relevant issue here is not about the terms of the alleged contract, *see 271 Truck Repair & Parts, Inc. v. First Air Express, Inc.*, 03-0700498-CV, 2008 WL 2387630 (Tex. App.— Austin June 11, 2008, no pet.), or whether the "meeting of the minds" element is satisfied, *see Buxani v. Nussbaum*, 940 S.W.2d 350 (Tex. App.—San Antonio 1997, no writ)). It is whether a reasonable jury could believe the Alleged Agreement ever existed.

are generally held to be conclusory." *Id.* at 292. The court concluded that the non-

movant's statements were not conclusory in light of the nature of the dispute: "the

veracity of [the non-movant's] allegations would be difficult to prove any other way,

and there are few material factual details omitted. It is difficult to imagine how [the

non-movant] could prove that she placed the opt-out form in the mail other than to

swear that she did so, above all when she was not instructed to mail the form via

private carrier or certified mail." *Id.* at 292-93.[39]

Here, unlike the defense raised in *Lester*, the Alleged Agreement defense is

not the type of defense that should be difficult to prove other than with the Donderos'

self-serving statements. If the Alleged Agreements actually existed, a reasonable

jury would expect that sometime between 2014 (when Dondero signed the first of

the sixteen Notes at issue) and 2021 (when Highland commenced the Adversary

Proceedings), Dondero would have at least:

- made some written record memorializing the existence or terms of the Alleged Agreements; or

- sent Nancy a communication confirming the existence or terms of the Alleged Agreements; or

- disclosed the Alleged Agreements to Highland's outside auditors, PwC, as he was obligated to do under the annual management representation letters he personally signed; or

---

[39] *Bargher v. White*, 928 F.3d 439 (5th Cir. 2019), is also distinguishable. The Court held that Bargher created a genuine dispute of material fact because the statements were not unsubstantiated, but were corroborated by other evidence. *Id.* at 445-46. Here, the Donderos' statements are corroborated by nothing.

- corrected Highland's internal books and records which consistently carried the then-outstanding principal and interest due under the Notes as assets; or

- informed the Retail Board that the Advisors' obligations under the Notes were subject to the Alleged Agreements so that the Advisors' financial condition was accurately portrayed in the annual review; or

- informed his co-founder and (until Highland's Plan went effective) the co-owner of Highland (and also a minority partner in HCMFA), Mark Okada, that Highland's value was subject to the Alleged Agreements; or

- informed Waterhouse—the CFO of Highland, HCMFA, and NexPoint— of the existence of the Alleged Agreements before the Adversary Proceedings were commenced so that Waterhouse could properly do his job; or

- corrected the Debtor's schedules and monthly financial statements that were filed with the Bankruptcy Court over an 18-month period, even when he still controlled Highland; or

- objected to Highland's Disclosure Statement on the ground that the Projections and Assumption were inaccurate because they did not disclose that the Notes were certain to be forgiven when the reorganized debtor sold the so-called portfolio companies as contemplated by the asset monetization plan; or

- following the commencement of litigation, immediately (a) disclosed the existence and terms of the Alleged Agreements, and (b) identified his sister, Nancy, as his counterparty, rather than changing his story multiple times, including initially claiming that he entered into the Alleged Agreements on Highland's behalf and failing to name Nancy as someone with relevant information in his Rule 26 disclosures and his interrogatory responses.

The Dondero Declarations are precisely the type of uncorroborated, self-serving statements that are insufficient to create a genuine dispute of material fact sufficient to defeat summary judgment. *See Lawrence,* 276 F.3d at 197 (affirming

summary judgment to recover on promissory notes where defendant's only evidence rebutting plaintiff's *prima facie* case was uncorroborated, "self-serving allegations," finding "it does not seem any such evidence exists. Such self-serving allegations are not the type of 'significant probative evidence' required to defeat summary judgment") (quoting *Mun. Bond,* 672 F.2d at 440)); *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 293-94 (5th Cir. 2004) (affirming summary judgment where non-movant "produced nothing but his own self-serving affidavit," and "[v]iewing the summary judgment evidence in the light most favorable to [non-movant], we agree with the district court's determination that [non-movant] failed to establish that a genuine issue of material fact exists… particularly when viewed in light of [movant's] overwhelming evidence" to the contrary).[40]

The Alleged Agreement defense is a fabricated story blatantly contradicted by the summary judgment record (*see supra* Sections F-G), and no reasonable jury could believe it. *See Salama v. W. Wind Energy Corp.*, No. 4:12–cv–035352013, WL 6079548, at *5 (S.D. Tex. Nov. 19, 2013) ("As the Supreme Court has noted, '[w]hen

---

[40] *BMG*, 74 F.3d at 90 (affirming summary judgment on a fraudulent transfer claim, finding defendant's "conclusory, self-serving statement" that he transferred land to his sister merely to appease his father was insufficient to overcome substantial, contradictory evidence, and rejecting defendant's assertion "that this Court must consider these statements" made in answers to interrogatories in the "light most favorable to" defendant, explaining, "[t]he ultimate determination to be made by this Court … is whether the defendants have put forth sufficient facts to 'lead a rational jury to find for [the defendants],' and "[c]onsidering that the only evidence in support of the defendants' theory is a conclusory, self-serving statement by the defendant Hugo, the inference that the defendants ask this Court to make is unreasonable."); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) (nonmovant's "attempt to create a fact issue as to his knowledge by relying on a conclusory and self-serving affidavit is on unsteady ground.")

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment'") (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996) (mere conclusory allegations are not competent summary judgment evidence, and such allegations are insufficient, therefore, to defeat a motion for summary judgment); *Main Street Bank v. Unisen, Inc.*, No. H-06-3776, 2008 WL 11483415, at *7 (S.D. Tex. Feb. 15, 2008) ("The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment"). As the District Court found, the Alleged Agreement defense "does not pass the 'straight face' test for a myriad of reasons," and ***"no reasonable jury could find that there was truly an 'oral agreement' to forgive these loans."*** (ROA.34354 at 25) (emphasis in original).

2.  **The Dondero Declarations Fail to Create a Genuine Dispute of Material Fact Concerning the Non-Existence of the Alleged Agreement in the Second HCMFA Action**

HCMFA adopted (verbatim) the Alleged Agreement defense in the Second HCMFA Action and now contends that the District Court improperly disregarded the self-serving Dondero Declarations as (a) internally inconsistent; (b) contradictory to prior sworn testimony; (c) contradictory to HCMFA's Answer, and that in doing so, the court "weigh[ed] the credibility of the evidence." (*See* Br. at 29-41). These

arguments are meritless and wrongly suggest that courts must accept every assertion as true regardless of how indefensible and obviously contrived they may be. That is not the law.

As detailed above, the Donderos' statements are not corroborated by any evidence and are directly contradicted by a mountain of contemporaneous financial statements, e-mails, court filings. In fact, ***HCMFA paid off most of the principal it borrowed but that it now contends was to be forgiven as part of Dondero's "compensation."*** In context, Appellants' strenuous effort to rehabilitate the Donderos' statements is futile.

### a. The District Court Correctly found that the Dondero Declarations Are Contradictory and Internally Inconsistent

In addition to being unsubstantiated, the Dondero Declarations are self-contradictory and internally inconsistent. HCMFA argues that in finding Dondero's statements in his declaration to be self-contradictory, the District Court "split hairs by using semantics of Dondero's language against him." (Br. at 34). HCMFA misconstrues the Court's findings.

The District Court found numerous internal inconsistencies in Dondero's declaration, including on the issues of (a) who the parties were to the Alleged Agreements, (b) the purpose of the Alleged Agreements, and (c) who entered into the Alleged Agreements on Highland's behalf (ROA.75191 at 39) (citing Def. Ex. 4 at ROA.74884-74885 ¶¶ 11). In its analysis, the District Court found similar

inconsistencies in Nancy's declaration, including her illogical statements that, on the one hand, Dugaboy entered into the Alleged Agreement with Highland on behalf of HCMFA, but on the other, the Alleged Agreement was a "binding and enforceable agreement between Highland and Jim Dondero," not between Highland and HCMFA. ROA.75192 (citing Def. Ex. 5 ROA.74951-74952 ¶¶ 7, 9, 12).

The District Court's finding that the Dondero Declarations were self-contradictory and internally inconsistent was only one of many reasons why the District Court held that HCMFA failed to rebut Highland's *prima facie* case. ROA.75184, stating that "[t]he only summary judgment evidence submitted by HCMFA in support of its Alleged Oral Agreement Defense is the conclusory, self-serving, unsubstantiated declarations of Mr. Dondero and his sister, Ms. Dondero, regarding the existence of the Alleged Oral Agreements."). In the face of the overwhelming evidence demonstrating the existence, validity, and enforceability of the Pre-2019 Notes, the District Court properly found that the siblings' internally inconsistent, contradictory, and illogical statements could not convince a reasonable jury that the Alleged Agreements existed. As the District Court explained, "HCMFA's version of the facts is 'blatantly contradicted by the record, so that no reasonable jury could believe it' and so the court should adhere to the Supreme Court's admonition and not accept HCMFA's allegations of a fact for purposes of ruling on the MSJ." ROA.75193 at 41 (quoting *Scott*, 550 U.S. at 380).

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

This finding should be affirmed. *See Cooper Cameron Corp. v. United States Dep't of Labor*, 280 F.3d 539, 550 (5th Cir. 2002) ("[A party] cannot meet its [summary judgment] burden with an internally inconsistent, self-contradictory affidavit."); *Freeman v. City of Fort Worth, Texas*, 4:10-CV-888-Y, 2011 WL 2669111, at *3 (N.D. Tex. July 7, 2011) (where the district court concluded that the non-movant's internally inconsistent and self-contradictory affidavit was "insufficient to create a dispute of fact as to any material issues.")

### b. The District Court Correctly Found that Mr. Dondero's Declaration Contradicts His Prior Sworn Testimony Regarding the Alleged Agreements

Appellants argue that the District Court erred in finding that Dondero's declaration is "contradictory" with his prior sworn testimony, maintaining that Dondero's declaration simply "elaborates" on his testimony. (Br. at 35). However, based on the clear record on this case, the District Court correctly found that Mr. Dondero's declaration contradicts his prior sworn testimony regarding the Alleged Agreements, and such testimony is not competent summary judgment evidence. *See* ROA.75188-75190 at 36-38 (citing evidence that: (i) Dondero's declaration, which states that the Pre-2019 Notes were issued "***in lieu of compensation***," contradicts his prior deposition testimony that the Alleged Agreements were entered into in ***exchange for loans***; (ii) Mr. Dondero's declaration, which purports to recollect the Alleged Agreements covering the Pre-2019 Notes, contradicts his November and

May 2022 deposition testimony, in which Mr. Dondero could not describe any material terms of the Alleged Agreement or identify any of the Notes subject to the Alleged Agreements; (iii) Mr. Dondero testified in May 2022 that he could not recall the details of the 2016 Alleged Agreement, including whether the 2016 Alleged Agreement was with respect to both the 2014 Note and the 2016 Note or whether he had entered into an oral agreement with himself in 2014, ***when he was*** the Dugaboy trustee, with respect to the 2014 Note).

After Nancy Dondero testified that she could not have entered into the 2014 Alleged Agreement, Dondero filed yet another declaration in which he suddenly recalled the specifics of the Alleged Agreements with respect to the Pre-2019 Notes, testifying for the first time that, among other things, he, not Nancy, entered into the 2014 Note as Dugaboy's Trustee. As the District Court explained, these contradictions in Dondero's testimony are critical. "They go to the heart of whether the alleged conversations occurred in 2014/2015 and 2016/2017 or whether they happened at all because the ***only*** evidence submitted by HCMFA regarding the existence of these conversations are the Dondero declarations." ROA.75190 at 38. Such contradictory testimony is insufficient to defeat summary judgment. *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 234 (5th Cir. 2018) ("[A party] is not entitled to use a declaration 'that impeaches, without explanation, sworn testimony' to defeat summary judgment.") The District Court correctly held that the Donderos'

contradictory testimony would not lead a reasonably jury to believe the Alleged Agreement actually existed with respect to the Pre-2019 Notes.

### c. The District Court Correctly Found that Mr. Dondero's Declaration Contradicts HCMFA's Answer

For all these reasons, contrary to HCMFA's assertion, Mr. Dondero's declaration did not simply contain a "minor inconsistency" with HCMFA's Answer. (Br. at 36). It contained numerous inconsistencies rendering the declaration inherently unreliable, such as who entered into the Alleged Agreement, when they did so, and the purpose of such an agreement. Such issues "go to the heart" of the viability of Alleged Agreement defense. ROA.75190. The District Court did not "weigh" the credibility of conflicting evidence. It found that, by attempting to manufacture a dispute of fact through contradictory sworn statements to the court, and where those contradictory statements were the *only* "evidence" submitted to oppose a moving party's *prima facie* case for summary judgment, HCMFA could not rebut Highland's *prima facie* case. This is precisely the type of manufactured, sham, and inherently incompetent evidence that courts routinely find fails to defeat summary judgment. *Hacienda*, 718 F. App'x at 235 (explaining that the "sham affidavit" rule provides that a "party may not manufacture a dispute of fact merely to defeat a motion for summary judgment."); *Free v. Wal-Mart Louisiana, L.L.C.*, 815 F. App'x 765, 767 (5th Cir. 2020) (concluding that the district court "reasonably

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

applied the sham affidavit doctrine" when it struck an affidavit that conflicted with prior deposition testimony without explanation).[41]

HCMFA's case cites are inapposite. In *Kennett-Murray Corp. v. Bone*, 622 F.2d 887 (5th Cir. 1980), a "genuine issue" of fact existed as to the question of fraud in light of "a fair reading of" the non-movant's (Bone's) deposition testimony, and where Bone's affidavit is "***generally consistent*** with the position forwarded in the deposition," summary judgment was improper. *Id.* at 895 (emphasis added).

The court in *Kennett* distinguished the minor discrepancies in Bone's summary judgment evidence from the type of evidence propounded by a party in an improper "attempt to inject a factual dispute through a contradictory affidavit." *Id.* at 893. The court explained, despite the fact that a genuine dispute can exist even if a party's affidavit "conflicts with earlier testimony in the party's deposition," "a district court may grant summary judgment where an issue raised by affidavit is clearly inconsistent with earlier deposition testimony." *Id.* at 893 (citing *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)) ("If a party who has been examined at length on deposition could raise an issue of fact

---

[41] *See also Jonibach Management Trust v. Wartburg Enterprises, Inc.*, 136 F. Supp. 792, 821 n. 29 (S.D. Tex. 2015) ("the factual dispute d[id] not render summary judgment inappropriate," because "[i]rrespective of which document contains the more accurate account, the [plaintiffs] are bound by the admissions in their pleadings, and thus no factual issue can be evoked by comparing their pleadings with [the] affidavit," noting the prohibition against the submission of affidavits or declarations that contradict the party's pleadings for the purposes of defeating summary judgment); *Freeman*, 2011 WL 2669111, at *3 (non-movant's internally inconsistent and self-contradictory affidavit was "insufficient to create a dispute of fact as to any material issues.") (citations omitted).

simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact," finding that "neither the Perrino deposition nor the Perrino affidavit raises any issue which we can call genuine.")

Unlike the facts in *Kennett*, the Dondero Declarations were not, under any "fair reading," "generally consistent" with the facts plead in HCMFA's Answer (or Dondero's prior testimony). The inconsistencies and self-contradictions prevalent in the Dondero Declarations are the type that are "sham," manufactured, and insufficient to defeat summary judgment under *Kennett* and applicable case law. The District Court's finding that HCMFA's attempt to manufacture a dispute through declarations is prohibited by the "sham affidavit" rule should be affirmed.[42]

As the *Kennett* court explained, "the very object of summary judgment is to separate real and genuine issues from those that are formal or pretended, so that only the former may subject the moving party to the burden of trial." *Id.* at 894 (internal quotations omitted). Here, the "issues of fact" created by Appellants are not issues which this Court should reasonably characterize as genuine. They are sham issues which should not subject Highland to the burden of trial.

---

[42] Appellants' cite to *Mays v. Dir. Office of Workers' Comp. Programs*, 938 F.3d 637 (5th Cir. 2019) is equally misplaced. That case does not deal with self-serving affidavits in a summary judgment proceeding.

### 3. Appellants' Remaining Contentions are Insufficient to Create a Genuine Dispute of Fact Regarding the Non-Existence of the Alleged Agreement

#### a. HCMFA's Contention that Mr. Dondero's Silence upon Sale of MGM Is Not "Probative" of Whether the Alleged Agreement Exists Fails to Create a Genuine Dispute of Material Fact

HCMFA contends that Dondero not declaring the Notes "forgiven" when a portion of MGM shares were sold is not "probative" of whether the Alleged Agreement exists. (Br. at 42). HCMFA misconstrues the legal import of this fact. In noting Mr. Dondero's silence upon a supposed triggering event for the Alleged Agreement, the District Court found this to be just one example, among many, of an undisputed fact that contradicted any notion that the Alleged Agreements actually existed. ROA.34352-34354 at 23-25. Mr. Dondero had tens of millions of reasons to disclose the existence of the Alleged Agreements as part of the MGM transaction. His silence under the circumstances suggests only that any notion of the Alleged Agreement had not even been concocted as of the end of 2019, and that the Alleged Agreement defense was fabricated for litigation purposes.

HCMFA relies on its own post-hoc 2022 balance sheet to argue that Dondero did disclose the Alleged Agreements. (Br. at 42). But HCMFA created this balance sheet *after the commencement of the Adversary Proceedings*, including after the Second HCMFA Action. ROA.74947 (HCMFA's April 2022 Balance Sheet).

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

HCMFA fails to create any genuine dispute of fact regarding Mr. Dondero's failure to disclosure the Notes forgiven upon the sale of MGM in 2019.

### b. The District Court Correctly Found that the Alleged Agreements Would Not Constitute Valid Contracts

The District Court correctly found that the Alleged Agreements (if they existed) would be unenforceable as a matter of law for, among other reasons, a lack of consideration. ROA.75196 at 44. Appellants maintain that at the time the Alleged Agreements were "formed," Dondero was authorized under the LPA to set his own compensation, and that Dondero's "decision to make part of his compensation conditional upon his own performance instead of exercising his right under the LPA to increase the immediate cash component of his compensation provided adequate consideration in exchange for the Alleged Agreements." (Br. at 49-50). Appellants are wrong.

Pursuant to the Alleged Agreements, the Notes were to be forgiven if either (a) Mr. Dondero sold one of three "portfolio" companies "for greater than cost" (the "Dondero Sale Contingency") or (b) the portfolio companies were sold "on a basis outside of Defendant James Dondero's control" (the "Third-Party Contingency"). ROA.74398-74399 ¶ 41. There is no dispute that after the appointment of the Independent Board, the Dondero Sale Contingency has not and will never occur. The Alleged Agreements could only be enforced upon the satisfaction of the Third-Party Contingency.

54

There is *no* evidence in the record establishing that Highland has received or will receive anything of value under a Third-Party Contingency sale. Nancy testified as follows:

> Q: Did you expect Highland to benefit if the portfolio companies were sold on a basis outside of Mr. Dondero's control?
>
> A: I have no idea, John.
>
> Q: Did you have any idea – did you or Dugaboy have any idea when you entered into the agreement if Highland would benefit from the sale of the portfolio companies on a basis outside of Mr. Dondero's control?
>
> A: I wouldn't know that.

ROA.71209 at 203:7-18.

That is not surprising. Upon confirmation of Highland's Plan, the "portfolio companies" could only be sold by a third party— the reorganized Highland, under Seery's leadership. Yet, Appellants failed to come forward with *any* admissible evidence identifying the consideration Highland would receive for forgiving the Notes following a Third-Party Contingency sale precisely because none exists.

Appellants' case cites do not support their argument. In *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492 (Tex. 1991), the court held that the question of whether there was consideration was a fact issue where, *inter alia*, the terms of an agreement were "ambiguous" as to whether there was a bargained for exchange and where certain admissions "do not conclusively prove that there was no consideration." *Id.* at 496. Here, the terms of the Alleged Agreement, on their face,

conclusively demonstrative that the Alleged Agreement was not the result of a bargained for exchange. Appellants have failed to offer a scintilla of evidence as to how Highland would benefit from forgiving over $70 million in loans under the circumstances. *Garcia v. Lumacorp, Inc.*, No. CIV.A. 3:02-CV-2426, 2004 WL 1686635 (N.D. Tex. July 27, 2004), aff'd, 429 F.3d 549 (5th Cir. 2005) dealt with adequacy of consideration. Appellants fail to point to *any* consideration supporting the Alleged Agreements (assuming a factfinder would find they existed in the first place). Even if there were somehow consideration, however, it is grossly inadequate for the reasons discussed *supra*.

In *Katy Int'l, Inc. v. Jinchun Jiang*, 451 S.W.3d 74 (Tex. App. 2014), there was written evidence of consideration in the agreement. Here, not only is there no agreement reciting consideration, but there is no evidence at all showing any consideration. Other cases relied upon by Defendants are factually distinguishable because the record in those cases contained clear evidence that there was a detriment exchanged for a benefit.[43] There is no evidence here that, in agreeing to forgive

---

[43] See *1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 65–66 (Tex. App. 2018) (holding that an agreement was supported by consideration where one party to agreement gave up its rights under a lease); *Marx v. FDP, LP*, 474 S.W.3d 368, 378–79 (Tex. App. 2015) (there was valid consideration where the record supported that pursuant to certain provisions in the agreement, the parties "relinquished their disputed claims against each other in return for" ownership of property); *First Com. Bank v. Palmer*, 226 S.W.3d 396, 398–99 (Tex. 2007) (holding that guaranty agreements were supported by consideration where guaranties were executed in connection with renewal of promissory note to prevent payee from accelerating debt, noting that there is consideration in guarantee where guarantor's promise is given as part of the transaction that creates the guaranteed debt).

approximately $70 million in loans, there was any detriment to Mr. Dondero or benefit received by Highland. Appellants' remaining authority is more than 100 years old and, like their other cases, entirely irrelevant to the present facts.[44]

<b>c.</b> <b><u>The District Court Correctly Found that Nancy Dondero Did Not Have Authority to Enter Into the Alleged Agreement</u></b>

Appellants argue that the District Court erred in finding that Nancy Dondero lacked authority to bind Highland, arguing that under the LPA, Dugaboy could bind Highland to contracts with third parties. (Br. at 9, 52-53). Appellants incorrectly imply that Dugaboy, as a limited partner and acting alone, could negotiate on behalf of Highland and cause Highland to waive its rights under the Notes. Appellants ignore both the LPA and Delaware partnership law. As discussed above, nothing in the LPA authorizes Dugaboy to bind Highland to agreements without Highland's consent. *See supra* at Section G.4. Dugaboy, as a limited partner, "had no authority under the Highland partnership agreement to negotiate and enter into binding agreements on behalf of Highland." (ROA.34355 at 26) . For this additional reason, the notion that Nancy Dondero entered into the Alleged Agreement on behalf of Highland is, on its face, implausible, and the District Court's grant of summary judgment on the Alleged Agreement defense should be affirmed.

---

[44] *See Hoard v. McFarland*, 229 S.W. 687 (Tex. Civ. App. 1921); *Brown v. Jackson*, 40 S.W. 162 (Tex. Civ. App. 1897).

### d. Appellants' Contention that Nancy Dondero Was "Competent" to Enter into the Alleged Agreement is Without Merit and Fails to Create a Genuine Dispute of Material Fact Regarding the Non-Existence of the Alleged Agreement

The District Court found there were "*numerous reasons*" that no reasonable jury could find that the Alleged Agreement existed, including that, *inter alia,* Nancy had no meaningful knowledge surrounding the circumstances underlying the Alleged Agreement. ROA.34355-34357 at 26-28; ROA.34372 at 43 (citing evidence concerning Nancy's lack of knowledge regarding promissory notes, Highland's financials, loans made by Highland, and James Dondero's compensation). Appellants insist that Nancy was "competent" to enter contracts and contest the District Court's findings on the grounds that it improperly "criticizes the lack of first-hand information Nancy Dondero had about [Highland's] business practices when she entered the [Alleged] Agreements" and "references random bits of information that Nancy Dondero" lacked. (Br. at 51). Appellants mischaracterize the District Court's findings.

The District Court did not hold that the Alleged Agreements did not exist because Nancy was "legally incompetent." Rather, the District Court concluded that Nancy's utter lack of knowledge of critical facts and failure to inquire were additional factors, among numerous others, further supporting its conclusion that no reasonable jury could believe that the Alleged Agreements actually existed. The issue is not "legal competence," but whether a reasonable jury could conclude that

the Alleged Agreements existed given, among other things, the undisputed evidence that Nancy had no information, other than what her brother supposedly gave her, and made no effort to educate herself on any relevant issues. The District Court's conclusion in this regard is supported by the evidentiary record and should be affirmed.

Appellants' contention that the District Court found or implied that the Alleged Agreements are "unenforceable" because they were the product of a "unilateral mistake by Nancy Dondero," (Br. at 51-52), likewise misstates the court's finding. The District Court did not find that that Nancy Dondero's lack of knowledge of the circumstances surrounding the Alleged Agreement would have resulted in some "unilateral" mistake. It found that such evidence was one factor, among many, contradicting any notion of the existence of an Alleged Agreement. ROA.34355-34358 at 26-29. The District Court properly found that, for this additional reason, no reasonable jury could believe the Alleged Agreement defense. The District Court's finding should be affirmed.

e.    **Appellants' Assertion that the Nondisclosure of the Alleged Agreements Have No "Bearing" on their Enforceability Misses the Point**

Appellants maintain that the District Court improperly "relied on the fact that the [Alleged] Agreements were not disclosed" to anyone and that failure to disclose has "no bearing" on whether the [Alleged] Agreements are legally enforceable." (Br.

at 47). Appellants maintain that the Alleged Agreements were not "material," and Dondero had no reason to disclose them since forgiveness of the Notes was "*de minimus.*" (Br. at 47-48). Appellants' contentions again misconstrue the District Court's findings and are not credible.

The court did not hold that the Alleged Agreements were not "enforceable" on the ground that Dondero never disclosed them to anyone until after the Adversary Proceedings were commenced. Again, it found that there was a complete absence of evidence supporting the existence of the Alleged Agreement, highlighted by the fact that Dondero not did not disclose an agreement to forgive $70 million of notes to anyone in the world, including the Bankruptcy Court, Highland's auditors, Highlands CFO, or Highland's co-founder. Forgiveness of $70 million is not "*de minimis,*" and no reasonable jury would think so.

**C.**     **The District Court Correctly Found that There Was No Genuine Dispute of Material Fact That Highland Had No Contractual Obligation to Make Payments on Behalf of the Term Note Obligors**

The Term Note Obligors contend that the District Court improperly "disregard[ed] or disbelieve[d]" evidence in support of their defense that Highland had a contractual obligation to make payments on the Term Notes, and Highland's "negligence" caused their default. (Br. at 53-54). This contention is meritless.

The undisputed evidence established that (a) the plain terms of NexPoint's SSA did not require (or even authorize) Highland to make payments on NexPoint's

behalf without NexPoint's authorization, (b) NexPoint never authorized Highland to make any payments in December 2020; and (c) in fact, Dondero instructed Waterhouse *not* to make the Annual Installment Payment on the NexPoint Note. *See supra* at Section I.2.

Yet, straining to create a disputed fact, NexPoint insists that "there is admissible [evidence] that [Highland's] own negligence and fault caused" NexPoint's default." (Br. at 53). But the testimony relied upon does not create a "genuine" dispute of material fact.[45]

NexPoint's "course of conduct" theory fares no better.[46] Because NexPoint's clear and unambiguous SSA did not impose an affirmative obligation on Highland to make the payment on NexPoint's behalf, resort to extrinsic evidence is improper. *Addicks Services, Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 294 (5th Cir. 2010) ("When parties disagree over the meaning of an unambiguous contract, [t]he intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written.") (internal quotations omitted).

---

[45] NexPoint "evidence" is that a Highland employee, Kristin Hendrix, did not "reach out" to Dondero to confirm that Waterhouse (her supervisor) properly instructed her *not* to make any payments on behalf of the Advisors. (Br. at 18-19 (citing ROA.72428 at 71:3-20)).

[46] Under the circumstances, there was no "course of conduct" because December 2020 was the first time Dondero did not control both NexPoint and Highland when an Annual Installment payment was due. Thus, what may have previously been a "family affair" became an arm's length relationship after Dondero caused Highland to file for bankruptcy and ceded control to the Independent Board.

Even if NexPoint's SSA was ambiguous, the "course of dealing" theory is contradicted by Ms. Hendrix's unchallenged testimony that (a) Dondero's approval was *always* required for loan payments (ROA.72436-72437 at 103:5-105:2), (b) she *never* caused a loan payment to be made without obtaining Dondero's or Waterhouse's prior approval, (ROA.72441-72442 at 124:22-125:22), and (c) in any event, Waterhouse (her supervisor) instructed her *not* to make any payments from the Advisors to Highland (ROA.72428 at 71:3-20).

There is no genuine dispute of material fact that Highland had no contractual obligation to make the loan payment without NexPoint's authority—but even if it did, Dondero instructed Waterhouse *not* to make the payment.[47]

## D. The District Court Correctly Found That There is No a Genuine Dispute of Material Fact that the NexPoint, HCMS, and HCRE Notes Were Not "Prepaid"

While Appellants assert that "there is abundant evidence to support NexPoint's and HCMS's prepayment defenses" (Br. at 55), the District Court correctly found that the "unrefuted summary judgment evidence … clearly dispels any argument that prepayments may have averted any defaults." (ROA.34362 at 33)

---

[47] HCRE and HCMS's negligence defense is even more frivolous than NexPoint's because "there was no admissible evidence that HCMS and HCRE had a shared service agreement with [Plaintiff]." ROA.34363 at 34 n. 30 . HCRE and HCMS's argument that it had shared services agreements that were "established by oral agreement and course of conduct," is unsubstantiated and premised on a gross mischaracterization of testimony. (*See* Br. at 20-21 (citing Ms. Hendrix's testimony that Highland "make[s] payments all the time" without Dondero's or Waterhouse's instruction, when in fact, Ms. Hendrix specifically distinguished ordinary course "overhead" payments from "*something that's once a year that's more material in amount, such as a loan payment . . . that needs to get approved by Jim Dondero*.") ROA.72436-72437 at 103:5-105:2.

(Klos Dec. ROA.28585-28587 ¶¶ 3-14 and Amortization Schedule ROA.28601-28611).

As set forth above, it is indisputable that (a) under the Term Notes, prepayments must first be applied to "unpaid accrued interest" and then to unpaid principal (with no provision for holding "prepayments" in reserve to meet future obligations); (b) Waterhouse knew from the 13-week forecast that the Annual Installment payments were coming due, (c) Dondero instructed Waterhouse not to make any payment, and (d) the Term Note Obligors attempted to cure their defaults but had no contractual right to do so. *See supra* at ROA.28587.

Faced with this, the Term Note Obligors attempt to create an ambiguity in the words "accrued interest" but that fails because the common phrase is in the past tense and therefore cannot be interpreted to apply to future interest. Notably, the parties gave effect to the Term Notes' unambiguous terms prior to the commencement of litigation. The unrefuted evidence proves that in the absence of an agreement, the Term Note Obligors ***always*** paid their Annual Installment payment by December 31 ***regardless*** of how many millions they "prepaid" during the prior calendar year (*see* (Klos Dec. ROA.28585-28587 ¶¶ 3-14 and Amortization Schedule ROA.28601-28611).

Appellants' final suggestion that the clear and unambiguous terms of the Term Notes should be ignored because Highland "needed the money" is meritless and does

not great a genuine dispute of material fact. (Br. at 23 (citing ROA.74599, J Dondero Dec., ¶42; , Kristen Hendrix 10/27/21 Tr. ROA.72431 at 81:13-82:3)). The District Court's finding that Appellants failed to create a genuine dispute of fact regarding their "prepayment" defense should be affirmed.

E.    **The District Court Correctly Found That There is No  Genuine Dispute of Material Fact Regarding HCMFA's "Mutual Mistake" Defense**

1.    **Waterhouse Had Actual and Apparent Authority to Execute the HCMFA Notes**

HCMFA contends the District Court erred in finding that there is no genuine dispute of material fact that Mr. Waterhouse was authorized to sign the HCMFA Notes was "error as a matter of law" because Waterhouse supposedly lacked apparent and actual authority to execute the HCMFA Notes. (*See* Br. at 68-69). This assertion is likewise baseless.

"The term 'actual authority' denotes that authority that a principal intentionally confers upon an agent or intentionally allows the agent to believe himself to possess." *Polland & Cook v. Lehmann*, 832 S.W.2d 729, 738 (Tex. App. 1992). Apparent authority arises when the "principal has acted in a manner that manifests the alleged agent's authority and whether the third party reasonably relied on the agent's authority." *Commercial Capital Holding Corp. v. Team Ace Joint Venture*, No. CIV. A. 99-3040, 2000 WL 726880, at *5 (E.D.La. June 2, 2000).

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

The undisputed evidence establishing that Waterhouse had actual and apparent authority to sign the 2019 Notes includes:

- Dondero personally certified in HCMFA's *Incumbency Certificate* that Waterhouse was authorized to "execute any and all agreements on behalf of the General Partner [of HCMFA] in its capacity as the General Partner [of HCMFA]" (ROA.70073);

- In his capacity as HCMFA's Treasurer, Waterhouse understood that he was responsible for accounting and finance (ROA.71339-71340 at 25:22-26:3);

- Waterhouse swore that he would not have signed the HCMFA Notes if he did not believe he was authorized to do so (ROA.71369 at 143:24-144:20);

- Even by the time of his deposition in October 2021, no one had ever told Waterhouse that he was not authorized to sign the HCMFA Notes or that he made a mistake in doing so (ROA.71373 at 158:2-161:2);

- Waterhouse signed other material documents on behalf of the Advisors' including the NexPoint SSA (ROA.73446-73465);

- Waterhouse signed other promissory notes on behalf of entities controlled by Dondero in 2019, the same year he signed the HCMFA Notes (*see*, *e.g.*, ROA.53728-53730 and ROA.53731-53733); and

- the Bankruptcy Court, the Debtor and the estate's creditors all relied on the enforceability of the HCMFA Notes when the Disclosure Statement and Plan were approved and Seery defended the Projections and the Assumption (*see supra* at Section F.3).[48]

As the District Court found, there can be no genuine dispute regarding Mr. Waterhouse's authority to execute the HMCFA Notes. *Davis v. Bank of Am., N.A.*, No. H–13–1306, 2014 WL 1401677, at *3 (S.D.Tex. Apr. 10, 2014) (lack of actual

---

[48] HCMFA's argument that Waterhouse "confirmed" he lacked the authority to bind HCMFA, (Br. at 69) (citing ROA.39183 at 270:25-273:9), misrepresents Waterhouse's testimony. Waterhouse never testified that he did not have authority to execute the Notes.

authority defense is refuted where "the plain language of the" instrument establishes agent's authority); *Polland*, 832 S.W.2d at 738 (agent had actual authority where agent's acts were "within the scope of his" express authority and were "related to matters over which such authority extends"); *Commercial Capital*, 2000 WL 726880, at *5 (agents had apparent authority to represent that invoices would be paid by company where agents held title of project manager, generally approved invoices and checks, and where principal gave third party "a reasonable belief that [agents] had authority to act on behalf of [principal]").

HCMFA's reliance on Dondero's self-serving affidavit is unavailing (*See* Br. at 69) (citing ROA.43800-43801 at ¶¶ 2-3; ROA.43803 at ¶ 9) because it is directly contradicted by, among other things, (a) the Incumbency Certificate he personally signed, (b) Waterhouse's duties and responsibilities as an officer; (c) Dondero's silence throughout the Bankruptcy Case when the HCMFA Notes were carried as assets of the estate; (d) Dondero's silence when the HCMFA Notes were explicitly described in HCMFA's own audited financial statements; and (e) Waterhouse's signing of other agreements such as NexPoint's SSA pursuant to which substantial obligations were incurred.

Dondero's declaration is not the type of evidence sufficient to create a genuine issue of fact regarding Mr. Waterhouse's authority to sign the HCMFA Notes, especially in the face of the overwhelming conflicting evidence. *Lowery v. Bank of*

*Am., N.A.*, 04-12-00729-CV, 2013 WL 5762227, at *3 (Tex. App. Oct. 23, 2013) (plaintiff's "scintilla of evidence" failed to support defense that party was not authorized to sign promissory note); *Davis*, 2014 WL 1401677, at *3 (party "has failed to present evidence that raises a genuine issue of material fact regarding the [] agent's authority or lack thereof"); *Pryor v. Everhome Mortg. Co.*, No. 3:13–CV–2963–D, 2014 WL 5802716, at *3 (N.D.Tex. Nov. 7, 2014) (party presented evidence that is "insufficient to permit a reasonable jury to find that [agent] was not an authorized signatory").

HCMFA offers no support for of its contention that there is "no 'apparent' authority when the same individual is on both sides of the transaction and he knows that he lacks 'actual authority,'" (Br. at 68-69), other than through conclusory recitals of the law on unauthorized signatures and cites to inapposite case law. (*See id.* at 69 n. 226) (citing to TEX. BUS. & COMM. CODE § 3.402(a) (which states when a represented person is bound on an instrument if the instrument is signed by a representative); and § 3.403 (which provides that unauthorized signature is ineffective except as signature of unauthorized signer in favor of person who pays the instrument in good faith); *Kirkindoll v. Nat'l Credit Union Admin. Bd.*, 3:11-CV-1921-D, 2015 WL 1636534, at *9 (N.D. Tex. Apr. 13, 2015) (finding that nonmovant failed to raise genuine issue of material fact concerning party's authority where they "failed to produce any evidence … beyond his own unsupported and conclusory

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

allegations" rebutting the movant's case); *Gaines v. Kelly*, 235 S.W.3d 179, 183-84

(Tex. 2007) (no evidence that agent had any role in the negotiations, and instead, he

"acted merely as a middleman after negotiations had been completed). Here, just as

in *Kirkindoll*, HCMFA fails to adduce any evidence, beyond unsupported, self-

serving and conclusory allegations, to convince a reasonable jury that Waterhouse

did not have authority to sign the Notes. The District Court's holding on this issue

should be affirmed.

> **2.** **The District Court Correctly Found that HCMFA Failed to Raise a Genuine Issue of Material Fact Concerning the Mutual Mistake Defense**

HCMFA argues that the District Court erred in finding that there is no genuine

dispute of material fact regarding its Mutual Mistake defense, maintaining that

HCMFA "introduced significant, admissible evidence" in support of its defense. (Br.

at 69-70). This argument is meritless, as a matter of fact and law.

Factually, there is not a single, contemporaneous document even suggesting

that (a) HCMFA accused Highland of causing the NAV Error; (b) HCMFA

demanded "compensation," or (c) Highland accepted responsibility for the NAV

Error or agreed to "compensate" HCMFA for anything. Instead, the undisputed,

contemporaneous documentation and information—the HCMFA Notes, the e-mails,

the audited financial statements, the report to the HGAF Board, the lack of disclosure

to the insurance carrier that paid HCMFA $5 million on account of the NAV Error

(*see supra* at Section H)—directly contradicts HCMFA's Mutual Mistake defense and Dondero's self-serving statements cannot change that.

HCMFA's Mutual Mistake Defense also fails as a matter of law. "Mutual mistake" nullifies an agreement only where both parties to the agreement have a "common intention," but the written agreement incorrectly reflects that common intention due to a mutual mistake. *See Whitney Nat. Bank v. Med. Plaza Surgical Center L.L.P.*, No. H-06-1492, 2007 WL 3145798, at *6 (S.D. Tex. Oct. 27. 2007) (citing Texas law); *Looney*, 2010 WL 532431, at *5 (for "mutual mistake" to nullify a promissory note, the evidence must show that "both parties to the note were acting under the same misunderstanding of the same material fact"); *Al Asher & Sons, Inc. v. Foreman Elec. Serv. Co., Inc.*, MO:19-CV-173-DC, 2021 WL 2772808, at *9 (W.D. Tex. Apr. 28, 2021) ("When mutual mistake is alleged, the party seeking relief must show what the parties' true agreement was and that the instrument incorrectly reflects that agreement because of a mutual mistake").

Highland's consistent, uninterrupted recording of the HCMA Notes on its balance sheet and as assets of the bankruptcy estate—much of which was prepared while Dondero controlled Highland—renders ridiculous any notion of mutuality. Indeed, the contemporaneous evidence indisputably shows that ***both parties*** intended the Notes to document loans. *See supra* at Section H.1.

HCMFA argument that Highland's "internal policies and procedures would have required the notes to go through [Highland's] legal department," (Br. at 75), has no evidentiary support and is directly contradicted by Dondero, (*see* ROA.70696-70703 (when asked to identify who drafted the promissory notes that he executed, Dondero believed "*they were drafted by an individual in either the Highland legal or finance department*"). Consistent with Dondero's testimony, Highland's corporate accounting and finance group prepared HCMFA's 2019 Notes just as it had for Dondero's own Notes. *Compare* ROA.72285-72286 and ROA.72289-72290 (e-mails among accounting group members concerning the preparation of Dondero's Notes) *with* ROA.70154-70157 and ROA.70160-70161 (e-mails among accounting group members concerning the preparation of the 2019 Notes).

The Mutual Mistake defense fails as a matter of law. *Whitney*, 2007 WL 3145798, at *6 (finding mutual mistake defense "fails as a matter of law" where assertions were "insufficient to raise a fact issue as to mutual mistake of fact regarding written agreement where plaintiff "has presented competent evidence" of its own intention regarding the agreement, "there is no evidence that [plaintiff] had the intent that these defendants assert," "no document suggests any such intent," and where "the documents are clear" on their face); *Looney*, 2010 WL 532431, at *5 (granting summary judgment in favor of plaintiff for breach of note as a matter of

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

law on "mutual mistake" defense where defendant "does not cite any record evidence in support of its claim that [parties] were operating under a shared mistake when they executed the note"); *Hitachi Capital Am. Corp. v Med. Plaza Surgical Ctr., LLP.*, CIV.A. 06-1959, 2007 WL 2752692, at *7 (S.D. Tex. Sept. 20, 2007) (finding "mutual mistake" defense fails as a matter of law where "there is no evidence that a *mutual mistake* was made in the [agreement,]" and where "the fact that [defendant] did not discover the 'mistake' until well after the [] agreements were signed undermines" the mutual mistake defense) (emphasis in original); *Al Asher & Sons*, 2021 WL 2772808, at *9 (finding that defendant failed to carry its burden to establish there is a genuine issue of material fact as to mutual mistake under an agreement, noting that "mutual mistake" defense is inapplicable as a matter of law, because, even if [defendant's] assumption regarding the [ ] contract is a mistake of fact, there is no evidence in the record that Plaintiff and [defendant] mutually held the mistake … ").[49] Accordingly, the District Court correctly found that HCMFA

---

[49] HCMFA asserts that the Bankruptcy Court and District Court "erred as a matter of law in denying the defense" that Waterhouse did not sign the Notes. (Br. at 66-68).   There can be no question that the Bankruptcy Court properly exercised its discretion in denying HCMFA leave to assert the Barred Defense on the ground that, in pertinent part, it was futile. *See Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993) ("Whether leave to amend should be granted is entrusted to the sound discretion of the [trial] court.") For all the reasons discussed above, the undisputed evidence demonstrates the validity and existence of the Notes, (*see supra* at Section H.1), and HCMFA introduces no evidence to rebut Highland's *prima facie* case, including with respect to its unsupported, conclusory, and last-minute argument that Waterhouse did not sign the Notes.

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.

failed to create a genuine dispute of material fact in support of its Mistake Defense, and its grant of summary judgment against HCMFA in the Main Notes Litigation should be affirmed.

## **CONCLUSION**

For the foregoing reasons, Appellee respectfully requests that this Court affirm the District Court's Orders in all respects.

**ERROR! UNKNOWN DOCUMENT PROPERTY NAME.**

March 27, 2024

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Email: jpomerantz@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Appellee*

# CERTIFICATE OF COMPLIANCE WITH FRAP 32

1.     This document complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B), as supplemented by this Court's order of October 16, 2023 extending the word limit for principal briefs in this appeal to 19,000 words, because, including footnotes and excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 18,063 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced serif (Times New Roman) typeface at 14-point type (12-point for footnotes).

3.     Any required privacy redactions have been made under Circuit Rule 25.2.13, the electronic submission is an exact copy of the paper submission, and this document has been scanned for viruses and is free of them.

*/s/ Zachery Z. Annable*
Zachery Z. Annable

# CERTIFICATE OF SERVICE

I certify that, on March 27, 2024, the foregoing Brief of Appellee was electronically filed using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished via CM/ECF.

*/s/ Zachery Z. Annable*
Zachery Z. Annable